838 F.2d 856
 45 Fair Empl.Prac.Cas. 1721,
45 Empl. Prac. Dec. P 37,778
Frances JONES, Beverly Harder, Eleanor Murray, Linda Nickel,
and Mary Ruane, Plaintiffs-Appellees,
v.
TRUCK DRIVERS LOCAL UNION NO. 299, Defendant-Appellant.
 Nos. 85-1863/86-1104.
 United States Court of Appeals,
Sixth Circuit.
 Argued Feb. 16, 1987.
Decided Feb. 3, 1988.
Rehearing and Rehearing En Banc Denied March 21, 1989.
 
 Gerry M. Miller, Goldberg, Previant, Uelman, Gratz, Miller & Brueggeman, S.C., Marianne Goldstein Robbins (argued), Milwaukee, Wis., James P. Hoffa, Hoffa, Chodak & Robiner, Detroit, Mich., for defendant-appellant.
 Ellis Boal (argued), Ronald Reosti, Detroit, Mich., Gary A. Benjamin (argued), Detroit, Mich., for plaintiffs-appellees.
 Julius LeVonne Chambers, Charles Stephen Ralston, Steven L. Winter, NAACP Legal Defense and Education Fund, Inc., New York City, for amicus curiae, NAACP.
 Before MERRITT, WELLFORD and MILBURN, Circuit Judges.
 WELLFORD, Circuit Judge.
 
 
 1
 Plaintiffs, five women, were office clerical workers at the Detroit terminal of the Square Deal Cartage Co., a company engaged in the transportation of automobiles to local dealerships. In August 1977, Square Deal was purchased by Cassens Transport, Inc., another company in the same industry. Plaintiffs were not retained by Cassens after the takeover. Square Deal's driver, yard, and garage workers, all of whom are male, were retained by Cassens. The defendant, a local Teamsters union, represented the clerical as well as the driver, yard, and garage workers.
 
 
 2
 When they worked at Square Deal, the driver and yard workers had the same seniority list, but the garage and office workers each had a separate list. At the time of the merger, Cassens had drivers and yard workers on separate seniority lists represented by the same local union, but Cassens had no garage workers and had only nonunion office workers at its company headquarters in Illinois. In an effort to prevent any seniority and "bumping" problems as a result of the merger, the Central Southern Conference Automobile Transporters Joint Arbitration Committee recommended that Square Deal's drivers and yard workers be given an opportunity to bid on either driver or yard jobs at Cassens, and that Cassens should then prepare driver and yard workers seniority lists for the merged company, dovetailing the two companies' drivers and yard workers according to their respective years of service at either company. Office workers were not allowed to bid on non-office jobs, however, regardless of their accrued seniority. As a result, plaintiffs were left jobless by the merger.
 
 
 3
 In early 1978, four plaintiffs filed against Cassens unfair labor practice charges with the NLRB and Title VII sex discrimination charges with the EEOC. The EEOC issued right to sue notices against Cassens on January 22, 1979. None of the plaintiffs filed unfair labor practice or Title VII charges against the union with the NLRB or the EEOC. They settled their unfair labor practice case against Cassens.
 
 
 4
 On November 13, 1978, plaintiffs filed a complaint in the Circuit Court of Wayne County, Michigan. The original complaint contained three counts. The first, against Cassens and the union, was based on the contention that their agreement "excluded Plaintiffs from ... bidding rights ... because they were women." This count recognized that bidding under the agreement was "in accordance with the seniority they had as employees of Square Deal Transport," but plaintiffs claimed the negotiation between defendants recognizing seniority rights under the Square Deal collective bargaining agreement violated "Plaintiffs' right to be free of employment discrimination because of their sex."
 
 
 5
 The next count concerned the employer only and claimed a refusal to hire plaintiffs as "yard" workers solely because of their sex. We are not concerned here with this charge. Count III was against the defendant union for failing "to represent Plaintiffs' interests in their negotiations" with Cassens with respect to bidding on jobs, and in refusing to represent plaintiffs by reason of their sex in their grievances that Cassens "wrongfully refused to hire" them for "yard" work in violation of "state and Federal law" with respect to equal employment. Plaintiffs later amended the complaint to add a Title VII complaint against Cassens and the union, which was found by this court to have no merit against the union based on procedural failures, and was accordingly dismissed. The amended complaint also alleged a pendent cause of action against both defendants under "Michigan's Civil Rights Act, M.C.L.A. Sec. 37.2101 et seq."
 
 
 6
 We dismissed the plaintiffs' fair representation claim because plaintiffs failed to file their claim within the limitations period set out in DelCostello v. Teamsters, 462 U.S. 151, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983). See Jones v. Truck Drivers Local Union No. 299, 748 F.2d 1083, 1086 (6th Cir.1984). In our prior opinion, we set out, in part, the following facts:
 
 
 7
 At the time of the merger, Cassens had drivers and yard workers on separate seniority lists represented by the same local union, but Cassens had no garage workers and had only non-union office workers at its company headquarters in Illinois....
 
 
 8
 The efforts of plaintiffs and their Union to persuade Cassens' management to retain plaintiffs in some capacity after the merger were unsuccessful. When plaintiffs became aware that Cassens might not retain them after the merger, plaintiffs met with Wilson Holsinger, a union business agent, who testified that he first learned in August 1977 that Cassens did not plan to retain the plaintiffs and that Cassens Vice President Shashek told him he did not want any Union employees in the office and believed the work in the computerized Cassens office in Illinois to be beyond plaintiffs' abilities. Holsinger filed a grievance on behalf of the office workers, but plaintiffs testified he discouraged them from applying to do yard work at the merged company even though workers on the old Square Deal combined driver and yard worker list could obtain "extra" work without seniority in the garage and garage workers could obtain temporary work in the yard or as drivers.
 
 
 9
 748 F.2d at 1085.
 
 In remanding the case, we stated:
 
 10
 In her opinion below, the District Judge focuses primarily on the federal claims and fails to make specific findings of fact and conclusions of law concerning the state claim under Michigan's Elliott-Larsen Act, Mich.Comp.Laws Ann. Sec. 37.2204(a)-(d). We are unable to determine on review which particular sections of that Act are at issue and what particular Union conduct the District Judge found to violate the Act. We are unable to determine from the opinion below whether the District Judge found that the Union's actions constituted illegal exclusion or expulsion from membership, classification or segregation of membership, efforts to cause or attempt to cause Cassens to violate the Elliott-Larsen Act, failure to adequately represent plaintiffs in the grievance process, or a combination of some or all of these prohibited activities.
 
 
 11
 748 F.2d at 1086-87.
 
 
 12
 The district court amended her prior decision upon the remand by adding the following language:
 
 
 13
 Cassens did not want women in its terminal and the defendant union contrived that, despite its obligation to these women members, there would be none. Its course of conduct to the end constitutes violations of all the Elliott-Larsen Civil Rights Act's prohibitions against labor union conduct.
 
 
 14
 It again must be noted, in evaluating plaintiffs' prima facie case under Elliott-Larsen, that Michigan courts have uniformly applied the federal substantive law of discrimination, and the federal allocation of burdens, in adjudicating cases filed under Elliott-Larsen.
 
 
 15
 Accordingly, inasmuch as plaintiffs have made a prima facie case that the union's breach of its duty to fairly represent them because of their sex constituted a violation of Title VII, those facts also constitute a violation of M.C.L.A. Sec. 37.2204(a), as a failure to fairly and adequately represent members in the grievance process because of sex. Similarly, the above-outlined facts present a prima facie case of violation of M.C.L.A. Sec. 37.2204(a) and (b), as (a) discrimination against a member because of sex, and (b) limiting, segregating, and classifying members; failing and refusing to refer for employment in a way which would deprive an individual of employment opportunity and which would adversely affect employment conditions because of sex.
 
 
 16
 Finally, a prima facie case was made under M.C.L.A. Sec. 37.2204(c) that this union caused or attempted to cause an employer to violate this article. By foreclosing plaintiffs, because of their office-worker classification, from participating in the Bid for Cassens' yardwork which the Arbitration Committee had ordered to be conducted by Master (Company) seniority, the defendant union made it inevitable that Cassens maintain an all-male yard. Moreover, by refusing even to advise plaintiffs that it was authorizing Cassens to hire casual yard worker/clericals after the bid, and by refusing to meet with plaintiffs and Cassens management on the subject of jobs, this defendant union attempted to cause an employer to violate M.C.L.A. Sec. 37.2202(a) by failing or refusing to hire ... because of sex.
 
 
 17
 Jones v. Cassens Transport, 617 F.Supp. 869, 885 (E.D.Mich.1985) (emphasis added, citations omitted).
 
 
 18
 Section 204 of the Elliott-Larsen Act, M.C.L.A. Sec. 37.2204, provides as follows:
 
 
 19
 37.2204. Labor organizations; prohibited acts
 
 
 20
 Sec. 204. A labor organization shall not:
 
 
 21
 (a) Exclude or expel from membership, or otherwise discriminate against, a member or applicant for membership because of religion, race, color, national origin, age, sex, height, weight, or marital status.
 
 
 22
 (b) Limit, segregate, or classify membership or applicants for membership, or classify or fail or refuse to refer for employment an individual in a way which would deprive or tend to deprive that individual of an employment opportunity, or which would limit an employment opportunity, or which would adversely affect wages, hours, or employment conditions, or otherwise adversely affect the status of an employee or an applicant for employment, because of religion, race, color, national origin, age, sex, height, weight, or marital status.
 
 
 23
 (c) Cause or attempt to cause an employer to violate this article.
 
 
 24
 (d) Fail to fairly and adequately represent a member in a grievance process because of religion, race, color, national origin, age, sex, height, weight, or marital status.
 
 
 25
 The district court refers to the union's failure fairly to represent the female plaintiffs under Sec. 37.2204[1] without referring to Sec. 37.2211 which recognizes that it is not an unlawful employment practice under the Act to take employment actions "pursuant to a bona fide seniority or merit system." Section 37.2211 tracks the language of Sec. 703(h) of Title VII, 42 U.S.C. Sec. 2000e-2(h), which has been held to mean that
 
 
 26
 although a seniority system tends to perpetuate effects of pre-Act discrimination resulting in one group having greater seniority than another, Title VII does not outlaw, destroy or water down an otherwise neutral, legitimate seniority system or the vested seniority rights attendant thereto simply because the employer had engaged in discriminatory hiring or promotion prior to the passage of the Act.
 
 
 27
 Detroit Police Officers Ass'n v. Young, 446 F.Supp. 979, 1008 (E.D.Mich.1978) (citing Teamsters v. United States, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977)), rev'd on other grounds, 608 F.2d 671 (6th Cir.1979), cert. denied, 452 U.S. 938, 101 S.Ct. 3079, 69 L.Ed.2d 951 (1981).
 
 
 28
 The district court has made the finding of liability against defendant union in the context of its "duty to represent" the plaintiffs under M.C.L.A. Sec. 37.2204.
 
 
 29
 The district court opinion makes reference to breach of duty to represent fairly "in the grievance process because of sex." In the original complaint itself, plaintiffs recognized that the bidding for positions after the merger was in accord with past seniority rights while employed at Square Deal Transport, but they maintained this effectuated sex discrimination. This contention would seem to run afoul of the Michigan Sec. 211 provision recognizing a legitimate seniority system. See Firefighters Local Union No. 1784 v. Stotts, 467 U.S. 561, 104 S.Ct. 2576, 81 L.Ed.2d 483 (1984); Wygant v. Jackson Board of Education, 476 U.S. 267, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986). The district court failed to take this into account and held erroneously that the union breached its duty to represent fairly and adequately by reason of sex discrimination simply by failing to insist that the collective bargaining agreement be carried out so as to permit plaintiffs to transfer into another bargaining unit.
 
 
 30
 The claim of sex discrimination against a union under the Elliott-Larsen Act is akin to the claim of a union's failure "fairly and adequately [to] represent a member ... because of the member's handicap" as set out in M.C.L.A. Sec. 37.1204(d).[2] The Michigan Handicappers' Act, above noted, precludes, in effect, discrimination by reason of an employee's handicap instead of the employee's sex, as is involved in the instant case. This duty not to fail to represent fairly under the Michigan Handicappers' Act was held by this court recently not to be an imposed new duty on a union "not already clearly present under existing federal labor law." Maynard v. Revere Copper Products, Inc., 773 F.2d 733, 735 (6th Cir.1985). We stated further in Maynard:
 
 
 31
 The doctrine of preemption is firmly established in labor law. The duty of fair representation relates to an area of labor law which has been so fully occupied by Congress as to foreclose state regulation. Whether union conduct constitutes a breach of the duty of fair representation is a question of federal law. Motor Coach Employees v. Lockridge, 403 U.S. 274, 299, 91 S.Ct. 1909, 1924, 29 L.Ed.2d 473 (1971). The fact that an action for failure to fairly represent a member may be brought in a state court, see Humphrey v. Moore, 375 U.S. 335, 84 S.Ct. 363, 11 L.Ed.2d 370 (1964), is beside the point. Regardless of the forum in which the claim is presented, the case is controlled by federal law. Id. at 343-44, 84 S.Ct. at 368-69.
 
 
 32
 773 F.2d at 735. The underlying collective bargaining agreement in this case, furthermore, contained an express non-discrimination section dealing with sex as well as other types of discrimination. The alleged underlying discriminatory actions in this case, then, clearly relate to a breach of the collective bargaining agreement and to the failure of the union fairly to represent the plaintiffs because of their sex. Interpretation of the contract was necessary to determine seniority and bargaining unit rights in this case. Interpretation of the contract was also inexorably intertwined in the union's delicate problem of representing different bargaining units in the merger of the operations after the Cassens' acquisition and merger. Interpretation and enforcement of the collective bargaining agreement is essentially and primarily a matter of federal labor law.
 
 
 33
 We believe that Maynard v. Revere Copper Products, Inc., 773 F.2d 733 (6th Cir.1985), is controlling here. The plaintiffs' action under state law is essentially the same as their claims under federal law against the union. They do not claim to be excluded from union membership, nor can they claim that seniority under the collective bargaining agreement was not followed. The employer and the union negotiated this collective bargaining agreement, and there is nothing in the record that plaintiffs opposed adoption of the collective bargaining agreement when consummated by the employer and the union. No grievance was filed by plaintiffs prior to the effectuation of the merger. There were no new rights created under the Michigan law nor any new duty imposed upon the union not already present under existing federal law. As in Maynard, essentially the same claim for failure to represent was previously found to be time barred under federal law which applied. This kind of claim, a failure to represent fairly, is essentially a matter of federal law, "an area of labor law which has been so fully occupied by Congress" as to foreclose or to preempt state regulation. Id. at 735.
 
 
 34
 Also, as found in Maynard, it would in this case, whose facts are analogous in many respects to the facts in Maynard, "be anomalous to hold that the same claim survived the defense of limitations [under DelCostello, supra ] because it was stated in terms of the state law designed to protect ... workers from discrimination." Id. at 735. We see no essential difference between an underlying claim of handicap discrimination and a claim of sex discrimination as a basis for assertion of a failure to represent fairly, as a matter of essential state or local interest. Such a charge is not essentially different from a claim of unfair labor practice by reason of some other kind of invidious discrimination on the part of a union or on the part of an employer. Unfair representation, then, is unfair representation whether by reason of sex discrimination, handicap discrimination, or a willful breach of responsibility to carry out clear terms of a collective bargaining agreement for the benefit of union members and employees. The claims of plaintiffs under these circumstances related to a failure fairly to represent or in respect to the collective bargaining agreement, must be deemed to be foreclosed and preempted. See Allis-Chalmers Corp. v. Lueck, 471 U.S. 202, 105 S.Ct. 1904, 85 L.Ed.2d 206 (1985).
 
 
 35
 The district court's underlying rationale for its finding of a failure of fair representation by reason of sex was tied to that court's assumptions and conclusions concerning the force and effect of the collective bargaining agreement with respect to separate bargaining unit seniority.
 
 
 36
 In our view the district court erred in its construction of the seniority system applicable to the Square Deal/Cassens merger. To understand the operation of that system, it is necessary to understand each of its component parts. The first level of seniority provided for office workers by the agreement is "terminal seniority." Terminal seniority allows an office worker to bid for jobs available in his bargaining unit within a particular terminal. See National Master Automobile Transporters Agreement, Michigan Office Workers Supplement, Article 38, Sec. 2 ("NMATA Supplement"). It is important to note that since office workers were restricted to a separate bargaining unit, terminal seniority could only be used to secure office work. "Company seniority" reflected an employee's seniority within the entire company rather than just a particular jobsite. In the event of layoffs at a particular jobsite, a senior employee could exercise seniority rights to gain employment at a different office, at the expense of the junior employee holding that other job. As with terminal seniority, however, office workers exercising company seniority could only bump other office workers; they could not "cross-bump" union workers from the non-office bargaining units. See NMATA Supplement, Article 39, Sec. 3.
 
 
 37
 Article 5, Section 1 of the National Master Automobile Transporters Agreement provides a procedure to combine seniority lists in the event of a merger. This section mandates "dovetailing" of the terminal seniority lists of the two merging entities. The district court read this section to require that one list be prepared for each company, with that list ranking employees by their seniority without regard to their bargaining unit. The effect would be to abolish the historic segregation of lists by job classification. Under this reading, an office worker with 15 years seniority could cross-bump a non-office worker with less seniority. Since this clearly would not be possible in the absence of a merger because of the clear language of Article 39, Secs. 2-3 of the NMATA Supplement, the district court must have found that the merger provision contemplated lumping all employees into one group regardless of their former bargaining unit with the effect of allowing cross-bumping.
 
 
 38
 We find no support for the district court's construction of the merger provision. The provision itself contemplates that multiple lists could result from dovetailing. The merger provision directs that the office workers' list from one company be merged with the office workers' list from the other company--and that other bargaining unit lists be combined in the same way--in order to maintain the segregation of workers by their bargaining unit or job description. The contract does not envision that the event of a merger will allow office employees to do what they could not otherwise: cross-bump less senior employees from different bargaining units.
 
 
 39
 The district court relied on a number of instances in which cross-bumping was allowed--including the driver/yard "special bid"--to determine that cross-bumping was not prohibited. Whatever the evidence on bumping between other bargaining units, it is clear that the office unit was never allowed to bump into non-office jobs. Custom and practice therefore reinforce the clear language of the contract provision in prohibiting office workers from cross-bumping, and the office workers had no right to bid for non-office jobs either before or after the merger.
 
 
 40
 Thus, we find the district court's analysis of the union's seniority defense to be erroneous, and we consider this error directly to affect the union's ultimate liability. The defense interposed by a bona fide seniority system would allow differences in compensation or terms, conditions or privileges of employment arising from the operation of such a seniority system. The disparity claimed here, however, is in the representation afforded female office workers by the union. The contract provisions required the union to deal with female office workers in a separate bargaining unit with no right to transfer seniority. The question is whether the defense of seniority within separate bargaining units without cross-bumping is a complete defense in this case to the substantive state law claims of plaintiffs.
 
 
 41
 The seniority defense involves labor contract interpretation and raises the specter of federal preemption under Sec. 301 of the Labor Management Relations Act. To the extent, then, that the district court could hold the union to have been liable for failure fairly to represent plaintiffs by reason of the effect of the agreement concerning non-transferability of bargaining unit seniority, it is erroneous despite the adverse impact upon plaintiffs as females.
 
 
 42
 In summary, we construe the district court's order and judgment essentially to have found the defendant union liable for its failure to represent the plaintiffs fairly. To the extent the district court imposed this liability by reason of the union's adherence to the terms of the collective bargaining agreement, neutral on its face, with respect to seniority recognition and bidding procedures, this ruling is precluded by virtue of Michigan law (Sec. 37.2211), which respects the legitimacy of seniority. Apart from the union's right to rely in good faith on the collective bargaining agreement seniority provisions, plaintiffs' claim against the union for failure to represent fairly under the contract is preempted by federal law, which governs the interpretation of the collective bargaining agreement. The district court's finding of unfair representation based upon sex discrimination also triggers interpretation of the collective bargaining agreement's antidiscrimination clause, again a matter of federal labor law preemption. See Maynard v. Revere Copper Products, Inc., 773 F.2d 733 (6th Cir.1985). The state law claim with respect to failure to represent fairly, akin to the federal claim of that same nature, is barred by the statute of limitations. That the claim here is based on sex discrimination rather than handicap discrimination is neither significant nor controlling. We limit our discussion of the preemption question to the subject of claimed unfair representation.
 
 
 43
 Our analysis must focus, then, on whether the [state cause of action] confers nonnegotiable state-law rights on employers or employees independent of any right established by contract, or, instead, whether evaluation of the [state] claim is inextricably intertwined with consideration of the terms of the labor contract.
 
 
 44
 Allis-Chalmers, 471 U.S. at 213, 105 S.Ct. at 1912.
 
 
 45
 Our concern in this case concerns the preemptive force of substantive federal law in respect to claims inextricably intertwined with the interpretation and construction of a collective bargaining agreement. We are not concerned with the question of jurisdiction between the NLRB and the federal courts. Vaca v. Sipes, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967), cited by the dissent, is therefore not relevant here.
 
 
 46
 What has been set out precludes liability against the union through implementation of the merger under the terms of the existing collective bargaining agreement. To the extent that plaintiffs make a claim of the union's post-merger discrimination by way of intentionally excluding or participating in intentional exclusion of females from the other bargaining units, apart from any effort to carry over office seniority to "yard" work or to driving, they may have stated and proved a state cause of action independent of the foreclosed and preempted claims. A remand for purposes of considering that limited area of liability and potential damages in the case of qualified plaintiffs who sought such positions is accordingly directed. That claim, a direct claim of sex discrimination against the union, apart from unfair representation under the collective bargaining agreement, remains for further determination.
 
 
 47
 When the district court reheard this case after our remand order, it did not recompute the damages allocable to the union but merely reinstated the judgment entered in the earlier proceeding. Although the plaintiffs had settled with the co-defendant employer in the interceding period, the district court saw no need to recompute the damages when an appeal was pending on liability. Thus the earlier judgment was reaffirmed despite the plaintiffs' concession that the union was entitled to a set-off to reflect the Cassens settlement. See Record on Motion to Affirm or Reinstate Judgment at 21.
 
 
 48
 The record on the motion to reinstate the judgment reflects genuine confusion as to the application of a set-off in favor of the union, the availability of prejudgment interest, and the appropriate interest rate for interest awards. As a result, regardless of our decision on preemption, we would be required to vacate the present damages award and remand for detailed findings of fact and conclusions of law on the intricate damages issues presented by this case.
 
 
 49
 When recomputing the damages, if any, attributable to the union's misconduct, the district court may not allow damages for lost wages which resulted from the plaintiffs' inability to use their office seniority to gain non-office jobs. The limitation on cross-bumping for office employees was established by the contract, not union misconduct. If the plaintiffs would have lost their jobs or failed to obtain new ones with Cassens even if the union were not guilty of claimed discrimination by way of excluding females entirely after the merger, the plaintiffs' recovery should be limited to compensation for the union's discrimination, if any, only in that respect. In other words, the union cannot be held liable for consequences it could not have prevented given the limitations imposed by the contract as we have construed it. Claims of those plaintiffs who may have sought other positions with Cassens (apart from seniority transfer) after the merger, then, may be considered upon remand in respect to liability and damages against the union.
 
 
 50
 We do not disagree with the dissent in respect to a conclusion that plaintiffs may, on remand, establish entitlement to an award for damages for sexually discriminatory exclusion from bargaining units after the merger (not based on a claimed violation of the collective bargaining agreement).
 
 
 51
 Accordingly, the case is REMANDED to the district court for the sole purpose of determining liability and damages, if any, consistent with this opinion.
 
 
 52
 MERRITT, Circuit Judge, concurring in part and dissenting in part.
 
 
 53
 In my judgment the majority does not adequately deal with the complex issues raised in this preemption case, and it applies an overbroad preemption doctrine to deny the plaintiffs their rights under state law. Moreover, I do not understand from the majority opinion what part of the plaintiffs' claims the majority is remanding for reconsideration or precisely what it expects the District Court to do on remand. I do not understand what is to be done because the Court does not make clear what part of the plaintiffs' sex discrimination claims are preempted and what part are not preempted.
 
 
 54
 Defendant Local 299 appeals the District Court's $365,334.23 judgment in favor of female union members who brought suit under Michigan's Elliott-Larsen Civil Rights Act for sex discrimination. The union's appeal challenges the decision of the District Court on four grounds, none of which are adequately discussed in the Court's opinion. First, the union argues that the District Court abused its discretion by retaining jurisdiction over the pendent state law claims after the federal claims were dismissed.[1] The union's second argument is that the District Court misapplied the Elliott-Larsen Act. The union's next claim is that federal labor law preempts Michigan's Elliott-Larsen Act in this case. And finally, the union claims that the District Court erred by reaffirming its prior judgment instead of instituting a new judgment which would incorporate plaintiffs' settlement with Cassens Transport.
 
 I. Factual Background and Proceedings Below
 
 55
 Plaintiffs, five women, were office clerical workers at the Detroit terminal of the Square Deal Cartage Co., a company engaged in the transportation of new automobiles to local dealerships. In August 1977, Square Deal was purchased by Cassens Transport, Inc., another company in the same industry. Plaintiffs were not retained by Cassens after the takeover. Square Deal's driver, yard, and garage workers, all of whom are male, were retained by Cassens. The defendant, a local Teamsters union, represented the clerical as well as the driver, yard, and garage workers.
 
 
 56
 When they worked at Square Deal, the driver and yard workers had the same seniority list, but the garage and office workers each had a separate list. At the time of the merger, Cassens had drivers and yard workers on separate seniority lists represented by the same local union, but Cassens had no garage workers and had only non-union office workers at its company headquarters in Illinois. In an effort to prevent any seniority and "bumping" problems as a result of the merger, the Central Southern Conference Automobile Transporters Joint Arbitration Committee recommended that Square Deal's drivers and yard workers be given an opportunity to bid on either driver or yard jobs at Cassens, and that Cassens should then prepare driver and yard workers seniority lists for the merged company, dovetailing the two companies' drivers and yard workers according to their respective years of service at either company. Office workers were not allowed to bid on non-office jobs, however, regardless of their accrued seniority. As a result, plaintiffs were left jobless by the merger.
 
 
 57
 In early 1978, four plaintiffs filed against Cassens unfair labor practice charges with the NLRB and Title VII sex discrimination charges with the EEOC. The EEOC issued right to sue notices against Cassens on January 22, 1979. None of the plaintiffs filed unfair labor practice or Title VII charges against the union with the NLRB or the EEOC. They settled their unfair labor practice case against Cassens.
 
 
 58
 On November 13, 1978, plaintiffs filed a complaint in the Circuit Court of Wayne County, Michigan, alleging a state claim and a federal claim. They alleged that Cassens and the Union had violated Michigan's Elliott-Larsen Civil Rights Act, Mich.Comp.Laws Ann. Sec. 37.2101 et seq. (1983), and that the union had violated Section 301 of the Labor Management Relations Act, 29 U.S.C. Sec. 185, by breaching its duty of fair representation. The union removed the case on November 30, 1978, to the United States District Court for the Eastern District of Michigan. Plaintiffs then filed an amended complaint in which they alleged that Cassens and the Union had violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. Sec. 2000e et seq.
 
 
 59
 The District Judge held that both Cassens and the union had violated Title VII and the Elliott-Larsen Civil Rights Act and that the union had breached its duty of fair representation. After the District Court issued its damages award in the amount of $365,334.23, both defendants appealed to this Court. Cassens settled its case and dismissed its appeal. Jones v. Cassens Transport, 538 F.Supp. 929 (E.D.Mich.1982).
 
 
 60
 After the Cassens settlement, proceedings against the union continued. On appeal, a panel of this Circuit dismissed the federal claims against the union. See Jones v. Truck Drivers Local Union No. 299, 748 F.2d 1083 (6th Cir.1984). The Title VII claim was dismissed because of plaintiffs' failure to file an EEOC charge against the union, and the unfair representation claim was dismissed on the statute of limitations as established by DelCostello v. Teamsters, 462 U.S. 151, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983). This Court remanded the case to the District Judge for additional findings of fact and conclusions of law on the remaining Elliott-Larsen Act claims. On remand, the District Judge considered additional briefs on the state law cause of action but did not substantially alter her first opinion. The union was again found liable for sex discrimination under the state statute. Jones v. Cassens Transport, 617 F.Supp. 869 (E.D.Mich.1985).
 
 
 61
 The factual findings made by the District Court fall into two broad categories. The first relates to the District Court's construction of the seniority provisions of the collective bargaining agreement and its conclusion that the plaintiffs were entitled to continued employment with Cassens after the merger. The union argued as a defense that the difference in treatment of the plaintiffs as a group resulted from the neutral application of a bona fide seniority system based on custom and practice in the industry, and not from gender-based discrimination. The District Court, however, found this argument "to be utterly without merit" based on its own interpretation of the seniority provisions. Jones, 617 F.Supp. at 886. "Defendant not only was not required by any seniority system to discriminate against plaintiffs as it did; but in fact it discriminated in violation of the applicable contract seniority provisions." Id. The Court also took issue with the use of separate seniority lists: "[t]hey utilized one list which was unique in treating two different all-male classifications as one while excluding a third (female) classification from that benefit; and they did so in violation of every applicable contract clause and of the arbitral decision...." Id. at 876.
 
 
 62
 The second group of factual findings concerns other, non-contractual evidence of discrimination. The District Court found that the union engaged in a pattern of discriminatory conduct: repeatedly refusing to negotiate with Cassens for the plaintiffs' jobs, id. at 877-82; making misleading statements to the female members about their rights and the zeal with which the union was protecting those rights, id. at 878, 882; failing to inform or consult the female members about the effects of the merger or seniority grievance procedures, id. at 877-78; and using segregated seniority lists to prevent women from competing with men for existing or new positions, id. at 883. Based on these facts, the Court further found as follows:
 
 
 63
 The credible facts of record here clearly demonstrate that, in competition for the better jobs historically[,] and for any jobs at the end, the plaintiff women were the victims of intentionally disparate and less favorable treatment than the similarly situated male employees at Square Deal whom this union represented. Both the union and employer intentionally discriminated against them, albeit for somewhat different reasons. Employer management, in the person of Messrs. Jones and Shashek, had a sex-based animus against female workers on the premises. The union pandered to that animus in its zeal to represent its male members (and even male outside applicants for jobs) at the expense of the women, whom it considered to be no more than an auxilary [sic] to the real bargaining unit, and a source of unobligated dues for twenty years.
 
 
 64
 * * *
 
 
 65
 * * *
 
 
 66
 The local union's actions were based upon invidious sex discrimination and no other reason. The union agreed with the employer that women did not belong in the yard and further, it was the position of the chief union operative, Holsinger, that the job security of the women, because of their sex, was a matter of less weighty concern than that of men.
 
 
 67
 Id. at 882-83. With these facts in mind, we turn to the legal issues raised by this case.
 
 II. The Elliott-Larsen Act
 
 68
 The union's first claim is that the District Court misapplied Michigan's Elliott-Larsen Act, Mich.Comp.Laws Ann. Secs. 37.2101-.2804 (1985). The District Court found the union liable for violating the specific terms of Sec. 37.2204(a)-(d), which deals with discrimination by a union against its membership.[2] Under the burden-shifting analysis incorporated into the Elliott-Larsen Act from Title VII, the District Court found that the plaintiffs proved a prima facie case of discrimination which the defendant did not rebut by offering nonpretextual, nondiscriminatory reasons. The union claims that Sec. 211 of the Elliott-Larsen Act, which exempts disparate treatment that results from a bona fide seniority plan, provides a defense to plaintiffs' prima facie case.
 
 
 69
 It is clear from the record that plaintiffs have indeed shown a prima facie case of discrimination by the union. The attitudes exhibited by the union officials reveal a pervasive gender bias that manifested itself in an unwillingness to represent the female office workers. The second category of factual findings which were described above amply illustrates this discrimination. I find the District Court's factual finding of discriminatory animus on the part of the union to be supported by the testimony and circumstantial evidence in the case.
 
 
 70
 Whether the union's seniority defense is sufficient to rebut the plaintiffs' prima facie case is a more difficult question. The union contended that the plaintiffs lost their jobs through the neutral operation of the seniority system, not discrimination by the union. The District Court, however, undertook its own examination of the seniority provision and determined that the plaintiffs would not have lost their jobs under the seniority system if it had been properly applied; therefore, the union could not claim the seniority system as a defense.
 
 
 71
 In my view the District Court erred in its construction of the seniority system applicable to the Square Deal/Cassens merger. To understand the operation of that system it is necessary to understand each of its component parts. The first level of seniority provided for office workers by the agreement is "terminal seniority." Terminal seniority allows an office worker to bid for jobs available in his or her bargaining unit within a particular terminal. See National Master Automobile Transporters Agreement, Michigan Office Workers Supplement, Article 38, Sec. 2 ("NMATA Supplement"). It is important to note that since office workers were restricted to a separate bargaining unit, terminal seniority could only be used to secure office work. "Company seniority" reflected an employee's seniority within the entire company, rather than within just a particular jobsite. In the event of layoffs at a particular jobsite, a senior employee could exercise seniority rights to gain employment at a different office, at the expense of the junior employee holding that other job. As with terminal seniority, however, office workers exercising company seniority could only bump other office workers; they could not "cross-bump" junior workers from the non-office bargaining units. See NMATA Supplement, Article 39, Sec. 3.
 
 
 72
 Article 5, Sec. 1 of the National Master Automobile Transporters Agreement provides a procedure to combine seniority lists in the event of a merger. This section mandates "dovetailing" of the terminal seniority lists of the two merging entities. The District Court read this section to require that one list be prepared for each company, with that list ranking employees by their seniority without regard to their bargaining unit. The effect would be to abolish the historic segregation of lists by job classification. Under this reading, an office worker with 15 years seniority could cross-bump a non-office worker with less seniority. Since this clearly would not be possible in the absence of a merger because of the clear language of Article 39, Secs. 2-3 of the NMATA Supplement, the District Court must have found that the merger provision contemplated lumping all employees into one group regardless of their former bargaining unit with the effect of allowing cross-bumping.
 
 
 73
 The District Court erred in its construction of the merger provision. The provision itself contemplates that multiple lists could result from dovetailing. The merger provision directs that the office workers list from one company be merged with the office workers list from the other company--and that other bargaining unit lists be combined in the same way--in order to maintain the segregation of workers by their bargaining unit or job description. The contract does not envision that the event of a merger will allow office employees to do what they could not do otherwise: cross-bump less senior employees from different bargaining units.
 
 
 74
 The District Court relied on a number of instances in which cross-bumping was allowed--including the driver/yard "special bid"--to determine that cross-bumping was not prohibited. Whatever the evidence on bumping between other bargaining units, it is clear that the office unit was never allowed to bump into non-office jobs. Custom and practice therefore reinforce the clear language of the contract provision in prohibiting office workers from cross-bumping, and the office workers had no right to bid for non-office jobs either before or after the merger.
 
 
 75
 Although I find the District Court's analysis of the union's seniority defense to be erroneous, this finding would not affect the union's ultimate liability. The defense interposed by a bona fide seniority system would allow differences in compensation, or in terms, conditions, or privileges of employment arising from the operation of such a seniority system. The disparity here, however, is in the representation afforded female office workers by the union. No seniority plan forced the union to ignore, mislead, or segregate the female office workers. The defense, therefore, affords no relief from the substantive basis of the plaintiffs' complaint--it is a meritorious, but incomplete defense.
 
 
 76
 The seniority defense, however, is important in two other respects. First, the process of labor contract interpretation that is required to prove or disprove the defense raises the possibility of federal preemption under Sec. 301 of the Labor Management Relations Act. This problem is addressed in the preemption section below. The second issue is whether the plaintiffs' inability to obtain new, non-office jobs with Cassens under their contract mitigates the damages attributable to the union's discrimination. In other words, if the plaintiffs would have lost their jobs anyway, what reduction is due in the damage award assessed against the union? This question is addressed in the section on damages also presented below.
 
 III. The Preemption Claims
 
 77
 Although I find that the union violated the Elliott-Larsen Act, the difficult issue in this case is whether a meritorious state-law discrimination action is nonetheless preempted by federal labor law.
 
 
 78
 Whenever federal regulatory legislation is enacted, numerous lawsuits urging preemption of similar state statutes and the establishment of federal common law rules can be expected. Certainly this has been true with respect to federal regulation touching the employer/employee relationship, as demonstrated by the litigative history of ERISA, NLRA, Taft-Hartley, Landrum-Griffin, and Title VII. Preemption issues touch the fundamental doctrines upon which our government is based: the separation of powers and federalism. Decisions regarding preemption are decisions interpreting the Supremacy Clause and the separation and allocation of power among the various tribunals of the state and federal governments of our federal system. The Supreme Court recently summarized the general thrust of preemption analysis:
 
 
 79
 [T]he NLRA contains no statutory pre-emption provision. Still, as in any pre-emption analysis, " '[t]he purpose of Congress is the ultimate touchstone.' " Where the pre-emptive effect of federal enactments is not explicit, "courts sustain a local regulation 'unless it conflicts with federal law or would frustrate the federal scheme, or unless the courts discern from the totality of the circumstances that Congress sought to occupy the field to the exclusion of the States.' "
 
 
 80
 Metropolitan Life Ins. Co. v. Commonwealth of Massachusetts, 471 U.S. 724, 747-48, 105 S.Ct. 2380, 2393, 85 L.Ed.2d 728 (1985) (citations omitted). The Court has consistently held that in enacting the NLRA and the LMRA, Congress did not intend to completely occupy the field; the States retain some authority to enact labor-related legislation. See Allis-Chalmers v. Lueck, 471 U.S. 202, 208-09, 105 S.Ct. 1904, 1909-10, 85 L.Ed.2d 206 (1985); Amalgamated Ass'n of Street, Electric Ry. & Motor Coach Employees v. Lockridge, 403 U.S. 274, 289, 91 S.Ct. 1909, 1919, 29 L.Ed.2d 473 (1971); Garner v. Teamsters Union, 346 U.S. 485, 488, 74 S.Ct. 161, 164, 98 L.Ed. 228 (1953).
 
 
 81
 The problem is that Congress has not indicated even in a general way how much state authority has been preempted. See Allis-Chalmers, 471 U.S. at 208, 105 S.Ct. at 1909; Lockridge, 403 U.S. at 289, 91 S.Ct. at 1919. Indeed, with respect to the relationship between a union and its members--the type of relationship we have in the instant case--there is some suggestion that Congress never intended to oust any state regulation. See Cox, Labor Law Preemption Revisited, 85 Harv.L.Rev. 1337, 1372-73 (1972); Cox, Recent Developments in Federal Labor Law Preemption, 41 Ohio St.L.J. 277, 284 (1980). The judicially-developed preemption rules create standards to determine the preemption questions left unanswered by Congress.
 
 
 82
 Four major interconnecting preemption doctrines exist. Two are involved in this case.
 
 
 83
 A. Interference with a Federally Guaranteed Right --Brown Preemption
 
 
 84
 The simplest preemption doctrine provides that the States may not regulate conduct that is actually protected by federal law. See Brown v. Hotel and Restaurant Employees Local 54, 468 U.S. 491, 503, 104 S.Ct. 3179, 3186, 82 L.Ed.2d 373 (1984). This principle is applicable to every conflict between state and federal substantive law, and flows directly from the Supremacy Clause. Id. Courts must first determine whether a federal right exists, and then assess the impact of a state regulation upon that federal right.
 
 
 85
 This simple rule is also simple to apply in the present case. It cannot be argued that the NLRA, or any federal statute, gives a labor union the right to engage in sex discrimination. Indeed, this Circuit has held that sex discrimination by a union constitutes an unfair labor practice prohibited by Sec. 8 of the NLRA. NLRB v. Local 106, Glass Bottle Blowers Ass'n, 520 F.2d 693 (6th Cir.1975); see also Bell & Howell Co., 230 N.L.R.B. 420 (1977). There can be no argument, therefore, that the Michigan statute is preempted by a conflict with a federally guaranteed substantive right.
 
 
 86
 B. Regulation of Labor/Management Balance of Power--Machinists Preemption.
 
 
 87
 A second variety of preemption operates when the State seeks to alter the economic power of labor or management. The NLRA established a balance of economic power between these competing factions. In that statute, Congress guaranteed some economic power through Sec. 7 protection, and prohibited some techniques by listing them as unfair labor practices under Sec. 8. However, by its silence as to other economic weapons, Congress indicated an intent to let some aspects of the labor/management relationship "be controlled by the free play of economic forces." Machinists v. Wisconsin Employment Relations Comm'n., 427 U.S. 132, 140, 96 S.Ct. 2548, 2553, 49 L.Ed.2d 396 (1976). As described in Belknap v. Hale, 463 U.S. 491, 499, 103 S.Ct. 3172, 3177, 77 L.Ed.2d 798 (1983), the preemption doctrine announced in Machinists "proscribes state regulation and state-law causes of action concerning conduct that Congress intended to be unregulated, ... conduct that was to remain a part of the self-help remedies left to the combatants in labor disputes." Belknap, 463 U.S. at 499, 103 S.Ct. at 3177 (citations omitted).
 
 
 88
 The rationale of the Machinists case makes clear that this type of preemption applies only to state action which affects the balance of power between labor and management. But the Michigan statute at issue here affects only the union's relationship to its members. It is also obvious that Congress did not intend to allow a union to use sex discrimination against its members as a "self-help" measure. Machinists preemption is therefore wholly inapplicable to the present case.
 
 
 89
 C. Interpretation of Labor Contracts--LMRA Sec. 301 Preemption
 
 
 90
 Section 301 of the Labor Management Relations Act, 29 U.S.C. Sec. 185(a), authorizes direct suit in the district courts for violations of a collective bargaining agreement. This statute has been interpreted as a mandate for the courts to fashion a uniform body of federal common law to resolve disputes over the interpretation and enforcement of these federal labor contracts. See generally Textile Workers v. Lincoln Mills, 353 U.S. 448, 456, 77 S.Ct. 912, 917, 1 L.Ed.2d 972 (1957); Field, Sources of Law: The Scope of Federal Common Law, 99 Harv.L.Rev. 883 (1986). This mandate means that in order to achieve the uniformity contemplated by Congress, the federal common law created through Sec. 301 should preempt state regulation of the terms of collective bargaining agreements. See Teamsters v. Lucas Flour Co., 369 U.S. 95, 103-04, 82 S.Ct. 571, 576-77, 7 L.Ed.2d 593 (1962). Section 301 preemption applies whenever a state rule "purports to define the meaning or scope of a term" in a collective bargaining agreement. Allis-Chalmers, at 471 U.S. 210, 105 S.Ct. at 1911. Claims cognizable under state law must be brought as Sec. 301 suits when they are "substantially dependent upon analysis of the terms of an agreement made between the parties in a labor contract." Id. at 220, 105 S.Ct. at 1916; I.B.E.W. v. Hechler, --- U.S. ----, 107 S.Ct. 2161, 2166 n. 3, 95 L.Ed.2d 791 (1987).
 
 
 91
 As noted by the Court in Allis-Chalmers, however, the preemptive scope of Sec. 301 is not all-encompassing: Congress did not intend to displace all state law concerning employment or collective agreements. 471 U.S. at 208, 105 S.Ct. at 1909; see also Michigan Mutual Insurance Co. v. United Steelworkers, 774 F.2d 104, 106 (6th Cir.1985) (interpreting Allis-Chalmers ). Therefore, "state rules that proscribe conduct, or establish rights and obligations, independent of a labor contract" are not preempted even if they are related to the agreement in some way. Allis-Chalmers, 471 U.S. at 212, 105 S.Ct. at 1912; Michigan Mutual, 774 F.2d at 106. The focus is on whether the effect of the state law can be altered by agreement of the parties. If the parties to a collective bargaining agreement can "contract away" the protection of the state statute, the statute is not sufficiently independent of that agreement and it is preempted. Allis-Chalmers, 471 U.S. at 213, 105 S.Ct. at 1912.
 
 
 92
 The Allis-Chalmers opinion illustrates the application of Sec. 301 preemption. At issue in that case was the effect of Sec. 301 on a Wisconsin tort statute allowing an employee to recover against an employer for the employer's bad faith in processing an insurance claim. In order to show bad faith on the part of his employer, the plaintiff had to prove the scope of the duty owed to him. Since this duty of care was in turn defined by the collective bargaining agreement, the tort suit could not be resolved without rendering an interpretation of the federal labor contract. Allis-Chalmers, 471 U.S. at 216-19, 105 S.Ct. at 1913-15. This dependence on the terms of the collective bargaining agreement caused preemption of the Wisconsin statute.
 
 
 93
 In I.B.E.W. v. Hechler, --- U.S. ----, 107 S.Ct. 2161, 95 L.Ed.2d 791 (1987), the Allis-Chalmers analysis was extended beyond the employee-employer relationship to suits between a union and its membership involving implied terms of the collective bargaining agreement. The plaintiff alleged that she was injured on the job because of inadequate training. The collective bargaining agreement contained language that placed some responsibility on the union to supervise the placement and training of its members. 107 S.Ct. at 2168 n. 4. The plaintiff brought a common-law negligence action against the union based upon the union's breach of a duty to place the plaintiff in a safe workplace. The union removed the case to federal court, and ultimately won a dismissal, on the grounds that Sec. 301 governed the plaintiff's cause of action. The Eleventh Circuit reversed the dismissal, holding that the tort action was independent of the collective bargaining agreement.
 
 
 94
 The Supreme Court granted certiorari in Hechler to resolve a split that decision had created with this Circuit's decision in Michigan Mutual Insurance Co. v. United Steelworkers, 774 F.2d 104 (6th Cir.1985), which held that Sec. 301 preempted a similar claim under Michigan law. In reversing the Eleventh Circuit's decision in Hechler, the Supreme Court focused on the source of the duty to provide adequate training which gave rise to the state tort action. Since the employer, not the union, had the common-law responsibility to provide a safe workplace, the union must have assumed that duty in the collective bargaining agreement or it would not be liable at all under the plaintiff's theory of the case. Therefore, the union's duty of care was wholly contractual and flowed from the collective bargaining agreement, not state common or statutory law. Hechler, 107 S.Ct. at 2167-68. Because "questions of contract interpretation ... underlie any finding of tort liability" where the duty at issue flows from the collective bargaining agreement, the Court concluded that Ms. Hechler's cause of action was preempted by Sec. 301. 107 S.Ct. at 2168 (quoting Allis-Chalmers, 471 U.S. at 218, 105 S.Ct. at 1915).
 
 
 95
 Unlike the actions at issue in Hechler, Allis-Chalmers, and in Maynard v. Revere Copper Products, Inc., 773 F.2d 733 (6th Cir.1985), cases which are clearly misinterpreted in the majority opinion, the duty at issue in the present case does not flow from the collective bargaining agreement. This distinction is crucial, because the noncontractual nature of the duty also means that it cannot be "waived or altered by agreement of [the] parties." Allis-Chalmers, 471 U.S. at 213, 105 S.Ct. at 1912. Liability under the Elliott-Larsen Act accrues for violating its statutory prohibitions on discrimination, not for the breach of a contractual duty of care established by the collective bargaining agreement. No contract interpretation is required to ascertain the scope of a statutory duty, this being precisely the kind of non-waivable, independent duty approved by the Allis-Chalmers Court. See Allis-Chalmers, 471 U.S. at 212, 105 S.Ct. at 1911.
 
 
 96
 In Maynard v. Revere Copper, supra, relied upon heavily by the majority opinion, Judge Lively, after quoting the Michigan statute prohibiting a union from failing "to fairly and adequately represent a member in a grievance process because of a member's handicap," says that:
 
 
 97
 Judge Guy [the district judge] concluded that this provision creates no new rights for an employee and imposed no duty on a union not already clearly present under existing federal labor law.
 
 
 98
 773 F.2d at 735 (emphasis added). Thus in Maynard the state law was held to be precisely the same as federal labor law and gave no rights different from and independent of those arising under the language of the labor management contract as interpreted under federal labor law. This is precisely the kind of problem the Supreme Court dealt with in Allis-Chalmers v. Lueck, supra. Allis-Chalmers is directly on point for the Maynard case but not in our case. Maynard is distinguishable from the instant case for the same reason that Lueck is distinguishable from our case: namely, the source of the sex discrimination rights that the plaintiff asserts are separate from and independent of rights under the collective bargaining agreement and federal labor law. In the next section, which deals with Garmon preemption, I will set out in more detail the reasons why the state's sex discrimination statutory tort does not overlap or impinge upon any federal labor law.
 
 
 99
 The present case is unusual, however, because the contract is interpreted to establish a defense, not to establish the duty upon which the action is based. I believe that this is the type of "tangential relationship" which is insufficient to trigger federal preemption. See Allis-Chalmers, 471 U.S. at 211, 105 S.Ct. at 1911. Section 301 was not enacted to allow a defendant to escape a state anti-discrimination statute by raising a labor contract in defense. Federal law must be used to establish the defense because the labor contract is itself a creature of federal law. But the fact that the labor agreement must be considered by the trial court in assessing liability for sex discrimination will not result in conflicting interpretations of these federal contracts, and therefore does not implicate Sec. 301 preemption.D. Interference With NLRB Jurisdiction--Garmon Preemption
 
 
 100
 It is unclear to me whether the majority is applying Garmon preemption to defeat and preempt state sex discrimination law or not.
 
 
 101
 When Congress enacted the National Labor Relations Act, it enacted comprehensive procedural rules and created a new tribunal--the National Labor Relations Board--to administer this specially designed regulatory structure. The result was a "complex and interrelated scheme of federal law, remedy, and administration" designed to achieve uniformity in our national labor policy. See San Diego Building Trades Council v. Garmon, 359 U.S. 236, 242-43, 79 S.Ct. 773, 778-79, 3 L.Ed.2d 775 (1959). Entrusting interpretation and enforcement of the NLRA to a "centralized administrative agency, armed with its own procedures, and equipped with its specialized knowledge and cumulative experience," was crucial to achieving the desired uniformity. Id. at 242, 79 S.Ct. at 778. Otherwise, differing judicial attitudes and procedures among multiple tribunals would inevitably produce conflicting interpretations of the NLRA. See Garner v. Teamsters Union, 346 U.S. 485, 490-91, 74 S.Ct. 161, 165-66, 98 L.Ed. 228 (1953).
 
 
 102
 The Supreme Court has fashioned a special preemption doctrine to protect the centralization of administration envisioned by Congress. In Garmon, the Court held that "[w]hen an activity is arguably subject to Sec. 7 or Sec. 8 of the Act, the States as well as the federal courts must defer to the exclusive competence of the National Labor Relations Board if the danger of state interference with national policy is to be averted." 359 U.S. at 245, 79 S.Ct. at 780. The breadth of the language used in this standard--"arguably subject to Sec. 7 or Sec. 8"--is meant to protect jealously the NLRB's authority to interpret and enforce the core sections of the statute. If primary administrative authority is to mean anything, it must include giving the NLRB the initial opportunity to determine whether conduct is protected activity under Sec. 7, or prohibited as an unfair labor practice under Sec. 8.
 
 
 103
 The Garmon opinion itself, however, admits exceptions to the NLRB's primary jurisdiction. Where the conduct at issue is of only "peripheral concern" to federal labor policy, centralized decision-making is not as important, Garmon, 359 U.S. at 243, 79 S.Ct. at 778; and the gains to be reaped from a diffusion of power in our federal system support limited state regulation of these "peripheral" matters. Id. In addition, respect for the regulatory role of the States also requires that their authority be maintained over activity "deeply rooted in local feeling and responsibility." Id. at 244, 79 S.Ct. at 779. This second exception is necessary because Congress has provided no compelling indication that it intended to deprive the States of their traditional power over these matters. Id.
 
 
 104
 The Garmon rule remains the general test for preemption, but a number of recent cases have addressed limitations on the rule that go beyond the two stated in the opinion. These cases reflect the Supreme Court's reluctance to apply Garmon in a "literal, mechanistic fashion." Sears, Roebuck & Co. v. Council of Carpenters, 436 U.S. 180, 188, 98 S.Ct. 1745, 1753, 56 L.Ed.2d 209 (1978). Of particular relevance here is the evolving distinction between conduct that is arguably "protected" and that which is arguably "prohibited" under the Act. Since there can be no argument that sex discrimination by a labor union is even arguably protected by the NLRA, we need to focus on the cases dealing with the "arguably prohibited" branch of Garmon.
 
 
 105
 Where a state cause of action prohibits conduct that is arguably prohibited by the NLRA, there is no danger that state regulation will interfere with conduct that Congress intended to protect. See Farmer v. United Brotherhood of Carpenters, 430 U.S. 290, 298, 302, 97 S.Ct. 1056, 1062, 1064, 51 L.Ed.2d 338 (1977). In such a case, the preemption question turns on a balancing of the respective federal and state interests in regulating the conduct. Id. at 300, 97 S.Ct. at 1063; Belknap v. Hale, 463 U.S. 491, 498-99, 103 S.Ct. 3172, 3177, 77 L.Ed.2d 798 (1983); Local 926, Int'l Union of Operating Eng'rs v. Jones, 460 U.S. 669, 676, 103 S.Ct. 1453, 1458, 75 L.Ed.2d 368 (1983). That the state cause of action presents "some risk" to an area of "primary federal concern" is insufficient to preempt it. Id. 430 U.S. at 303, 97 S.Ct. at 1065; Sears, Roebuck & Co. v. Council of Carpenters, 436 U.S. 180, 196 n. 25, 98 S.Ct. 1745, 1757 n. 25, 56 L.Ed.2d 209 (1978). Thus a statute which would be preempted under a rigid application of the Garmon rule may nonetheless be upheld if the State's interest is sufficiently compelling. Farmer, 430 U.S. at 302, 97 S.Ct. at 1064.
 
 
 106
 Another factor to be considered in the preemption equation is the extent to which litigation in the state forum will be similar to the federal proceeding in content and remedy. This concept is best stated by the Court in Sears, Roebuck & Co. v. Council of Carpenters. Reasoning from the "primary jurisdiction" rationale of Garmon and considering the procedural difficulties of obtaining Board review in some contexts, the Sears Court held that a state cause of action is preempted only where the controversy presented to the state court is identical to that which could have been presented to the Board. Sears, 436 U.S. at 197, 202, 98 S.Ct. at 1757, 1760. The focus is on the character of the litigation in the two forums: i.e. whether the predicate issues and available remedies are the same. See Cox, Recent Developments in Federal Labor Law Preemption, 41 Ohio St.L.J. 277, 282-84 (1980). Where this identity is lacking, the state court's adjudication of the state cause of action does not threaten the federal regulatory scheme because the state tribunal does not purport to act as a surrogate labor board. Sears, 436 U.S. at 197 n. 26, 98 S.Ct. at 1757 n. 26 (quoting Farmer, 430 U.S. at 304-05, 97 S.Ct. at 1065-66).
 
 
 107
 The foregoing cases establish a framework for deciding the Sec. 8 preemption question posed by the present litigation. As a starting point, there is no question that sex discrimination by a union against its members constitutes a breach of the union's duty of fair representation and is an unfair labor practice. See N.L.R.B. v. Local 106, Glass Bottle Blowers Ass'n, 520 F.2d 693 (6th Cir.1975); Bell & Howell Co., 230 N.L.R.B. 420 (1977). This triggers the presumption of preemption enunciated in Garmon, and the Michigan statute can survive preemption only if the "local interest" exception to Garmon is applicable.
 
 
 108
 I do not pause long on the question of whether sex discrimination is a matter of "local interest." Given the prevalence and perniciousness of gender-based discrimination in the workplace, the State of Michigan has an obvious and compelling interest in enacting prohibitory legislation. The State's interest here is at least as weighty as the interests that have justified a local interest exception in previous cases. See Farmer, 430 U.S. at 302, 97 S.Ct. at 1064 (infliction of emotional distress); Linn v. Plant Guard Workers, 383 U.S. 53, 86 S.Ct. 657, 15 L.Ed.2d 582 (1966) (libel); Automobile Workers v. Russell, 356 U.S. 634, 78 S.Ct. 932, 2 L.Ed.2d 1030 (1958) (physical violence). This interest is therefore sufficient to prevent preemption here unless the Michigan statute creates undue interference with the federal regulatory scheme.
 
 
 109
 In an analogous situation, the Supreme Court has held that private suits to enforce the union's duty of fair representation do not create undue interference with the federal regulatory scheme. In Vaca v. Sipes, 386 U.S. 171, 182-84, 87 S.Ct. 903, 912-14, 17 L.Ed.2d 842 (1967), the Court held that the history and special purpose of the duty of fair representation doctrine undercut the rationale for primary Board jurisdiction:
 
 
 110
 A primary justification for the pre-emption doctrine--the need to avoid conflicting rules of substantive law in the labor relations area and the desirability of leaving the development of such rules to the administrative agency created by Congress for that purpose--is not applicable to cases involving alleged breaches of the union's duty of fair representation. The doctrine was judicially developed in Steele [v. Louisville & N.R. Co., 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173 (1944) ] and its progeny, and suits alleging breach of the duty remained judicially cognizable long after the NLRB was given unfair labor practice jurisdiction over union activities by the L.M.R.A. Moreover, when the Board declared in Miranda Fuel [140 N.L.R.B. 181 (1962) enforcement denied, 326 F.2d 172 (C.A.2d Cir.1963) ] that a union's breach of its duty of fair representation would henceforth be treated as an unfair labor practice, the Board adopted and applied the doctrine as it had been developed by the federal courts. Finally, as the dissenting Board members in Miranda Fuel have pointed out, fair representation duty suits often require review of the substantive positions taken and policies pursued by a union in its negotiation of a collective bargaining agreement and in its handling of the grievance machinery; as these matters are not normally within the Board's unfair labor practice jurisdiction, it can be doubted whether the Board brings substantially greater expertise to bear on these problems than do the courts, which have been engaged in this type of review since the Steele decision.
 
 
 111
 In addition to the above considerations, the unique interests served by the duty of fair representation doctrine have a profound effect, in our opinion, on the applicability of the pre-emption rule to this class of cases.... [T]he duty of fair representation has stood as a bulwark to prevent arbitrary union conduct against individuals stripped of traditional forms of redress by the provisions of federal labor law. Were we to hold, as petitioners and the Government urge, that the courts are foreclosed by the NLRB's Miranda Fuel decision from this traditional supervisory jurisdiction, the individual employee injured by arbitrary or discriminatory union conduct could no longer be assured of impartial review of his complaint, since the Board's General Counsel has unreviewable discretion to refuse to institute an unfair labor practice complaint. The existence of even a small group of cases in which the Board would be unwilling or unable to remedy a union's breach of duty would frustrate the basic purposes underlying the duty of fair representation doctrine.
 
 
 112
 Vaca, 386 U.S. at 180-83, 87 S.Ct. at 912-13 (citations and footnotes omitted).
 
 
 113
 Furthermore, Congress has itself recognized that the primary NLRB jurisdiction must yield where a union discriminates against its members on the basis of sex. In order to vindicate the public interest in eliminating union discrimination without forcing recourse to inadequate NLRB procedures, Congress included a special provision in Title VII to cover discrimination by a union, and allowed this prohibition to be enforced by a private action. See 42 U.S.C. Secs. 2000e-2-5 (1982). Congress obviously found the potential interference caused by private suits to be acceptable in light of the importance of eradicating discrimination. Since the Michigan Elliot-Larsen Act is patterned after Title VII, it will not pose a significantly greater threat to national labor policy than that already endorsed by Congress.
 
 
 114
 The apparent contradiction between Garmon preemption and the approach taken in the Vaca case and Title VII can be resolved by reference to the original purpose of the preemption rule: ensuring that disputes within the Board's expertise were committed first to it. But, as Professor Cox has noted, "Congress has never developed a comprehensive and impliedly exclusive plan of federal regulation for union-member relations." Cox, Labor Law Preemption Revisited, 85 Harv.L.Rev. 1337, 1372 (1972). As a result, the NLRB has no special expertise over these disputes. Furthermore, the courts, not the NLRB, generally adjudicate discrimination actions. Since the NLRB has little expertise over either the parties or the subject-matter of the dispute, the primary jurisdiction rationale of Garmon does not apply to a discrimination suit between a union member and a union.
 
 
 115
 Moreover, whatever interference with NLRB jurisdiction is posed by the present claim, it is diminished by the marked dissimilarity between an Elliott-Larsen proceeding and an unfair labor practice charge. See Sears, 436 U.S. at 197, 98 S.Ct. at 1757. An Elliott-Larsen plaintiff controls her own lawsuit, while the unfair labor practice charge ultimately pits the NLRB, not the charging individual, against the party charged with the violation. While the Vaca Court described the drawbacks of NLRB representation from the plaintiff's perspective, 386 U.S. at 182-83, 87 S.Ct. at 912-13, an unfair labor practice proceeding does allow the aggrieved party a chance at redress without hiring a private attorney. Furthermore, distinct remedies--punitive damages under the state statute or decertification of the union under the NLRA--reinforce the discrete purposes of the two statutes. Stated in terms used by the Sears Court, an Elliott-Larsen action does not present a controversy "identical to ... that which could have been, but was not, presented to the Labor Board." 436 U.S. at 197, 98 S.Ct. at 1757.
 
 
 116
 I conclude, therefore, that the state statute is not preempted by the National Labor Relations Act. When measured against the weighty interest the State of Michigan has in eliminating discrimination, the potential interference with national labor policy created by the Elliott-Larsen Act is insufficient to force preemption of the statute. Both the Supreme Court in Vaca v. Sipes, and Congress in Title VII, have indicated the limits of the NLRA as an anti-discrimination statute. The State of Michigan has enacted a law that recognizes these limitations and prescribes an alternative remedy consistent with that provided by Congress in Title VII. Under these circumstances, there is no reason to believe that Congress enacted the NLRA to prevent such a salutary development in the laws of the States.
 
 IV. Damages
 
 117
 When the District Court reheard this case after our remand order, it did not recompute the damages allocable to the union but merely reinstated the judgment entered in the earlier proceeding. Although the plaintiffs had settled with the codefendant employer in the interceding period, the District Court saw no need to recompute the damages when an appeal was pending on liability. Thus the earlier judgment was reaffirmed despite the plaintiffs' concession that the union was entitled to a setoff to reflect the Cassens settlement. See Record on Motion to Affirm or Reinstate Judgment at 21.
 
 
 118
 The record on the motion to reinstate the judgment reflects genuine confusion as to the application of a setoff in favor of the union, the availability of prejudgment interest, and the appropriate interest rate for interest awards. As a result, I agree that we must vacate the present damage award and remand for detailed findings of fact and conclusions of law on the intricate damages issues presented by this case. On remand, the District Court should be instructed to recompute the damages based on the principles established by the Elliott-Larsen Act for that purpose.[3]
 
 
 119
 I agree that when recomputing the damages allocable to the union's misconduct, the District Judge should not allow damages for lost wages which resulted from the plaintiffs' inability to use their office seniority to gain non-office jobs. The limitation on cross-bumping for office employees was established by the contract, not union misconduct. I agree that if the plaintiffs would have lost their jobs even if the union had been diligent in its representation of them, the plaintiffs' recovery should be limited to compensation for the union's neglect. In other words, the union cannot be held liable for consequences it could not have prevented given the limitations imposed by the contract. I can see no reason, however, for refusing to allow the plaintiff any damages they suffered as a result of the union's use of segregated seniority lists to prevent the women from competing with men for existing or new positions for which they should have an equal opportunity to apply. Neither can I see any reason to disallow damages for the union's repeated refusal to negotiate for plaintiffs' jobs or for making misleading statements about the effects of the merger. Although the seniority provisions of the contract did not allow the office workers the right to cross-bump, the women were entitled to equal employment opportunity and equal union representation in all other respects.
 
 
 
 [1]
 While the district court refers to Sec. 37.2204(a), (b), and (c), she uses the words of subsection (d) which is analogous to the federal Sec. 301 charge which was dismissed
 
 
 [2]
 The language of this section tracks the language of the Elliott-Larsen Act (M.C.L.A. Sec. 37.2204):
 A labor organization shall not
 * * *
 Fail to fairly and adequately represent a member ... because of ... sex.
 
 
 [1]
 The pendent jurisdiction issue is easily disposed of in this case. Pendent jurisdiction in the federal courts is governed by United Mine Workers of America v. Gibbs, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), and its progeny. Since pendent jurisdiction is a doctrine of discretion and not of substantive right, the plaintiff must show that the federal court has the power to hear the state law claim and that it is prudent to do so. Id. at 725-26, 86 S.Ct. at 1138-39. The justification for pendent jurisdiction "lies in considerations of judicial economy, convenience and fairness to litigants; if these are not present a federal court should hesitate to exercise jurisdiction over state claims, even though bound to apply state law to them." Id. at 726, 86 S.Ct. at 1139 (citation omitted). Appellate review of a district court's decision to exercise pendent jurisdiction is governed by an abuse of discretion standard. Id. at 728, 86 S.Ct. at 1140
 In deciding whether pendent jurisdiction was proper after the remand order from this Court, the District Judge noted that the Gibbs analysis was colored by the protracted nature of this litigation, and by the fact that a full trial on the merits had already been held. Jones, 617 F.Supp. at 873. We agree that the history of this litigation supports an exercise of pendent jurisdiction in order to promote "judicial economy, fairness and convenience to litigants" as suggested by Gibbs. Accordingly, the District Court did not abuse its discretion by maintaining jurisdiction over the state law claims on remand after the federal claims were dismissed on appeal.
 
 
 [2]
 Section 204 of the Elliott-Larsen Act, Mich.Comp.Laws Ann. Sec. 37.2204, provides:
 
 
 [37]
 2204. Labor organizations; prohibited acts
 Sec. 204. A labor organization shall not:
 (a) Exclude or expel from membership, or otherwise discriminate against, a member or applicant for membership because of religion, race, color, national origin, age, sex, height, weight, or marital status.
 (b) Limit, segregate, or classify membership or applicants for membership, or classify or fail or refuse to refer for employment an individual in a way which would deprive or tend to deprive that individual of an employment opportunity, or which would limit an employment opportunity, or which would adversely affect wages, hours, or employment conditions, or otherwise adversely affect the status of an employee or an applicant for employment, because of religion, race, color, national origin, age, sex, height, weight, or marital status.
 (c) Cause or attempt to cause an employer to violate this article.
 (d) Fail to fairly and adequately represent a member in a grievance process because of religion, race, color, national origin, age, sex, height, weight, or marital status.
 
 
 [3]
 Since the Elliott-Larsen Act was modeled on Title VII, aspects of the federal action have been incorporated into the state statute. However, Michigan has interpreted the damages provision of the Elliott-Larsen Act to support an award of exemplary damages, a result not possible under Title VII. See Ledsinger v. Burmeister, 114 Mich.App. 12, 318 N.W.2d 558, 563 (1982). Thus, cases which address problems of contribution and indemnity under Title VII may not be helpful because of Michigan's apparent divergence from federal law on damages questions. See, e.g., Northwest Airlines, Inc. v. Transport Workers, 451 U.S. 77, 101 S.Ct. 1571, 67 L.Ed.2d 750 (1981); Anderson v. Local Union 3, I.B.E.W., 751 F.2d 546 (2d Cir.1984)