**Diane BREDESEN, Plaintiff,**

v.

**DETROIT FEDERATION OF MUSICIANS, LOCAL NO. 5, AFFILIATED WITH THE AMERICAN FEDERATION OF MUSICIANS, Defendant.**

**No. 00–CV–71630–DT.**

United States District Court,
E.D. Michigan,
Southern Division.

Sept. 28, 2001.

Barbara M. Harvey, Detroit, MI, for plaintiff.

Theresa Smith Lloyd, Bloomfield Hills, MI, for defendant.

## OPINION AND ORDER REGARDING DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS OR SUMMARY JUDGMENT

ROSEN, District Judge.

### I. INTRODUCTION

This Elliott–Larsen sex discrimination/Section 301 breach of duty of fair representation action is presently before the Court on Defendant's Motion for Judgment on the Pleadings or Summary Judgment. Plaintiff has responded to Defendant's Motion to which Response Plaintiff has replied. The Court heard the oral arguments of counsel on April 19, 2001, and at the conclusion of the hearing, ordered supplemental briefing. The parties have complied with the Court's directive. Having now had the opportunity to review and consider the parties briefs and supporting documents, the Court is now prepared to rule on this matter. This Opinion and Order sets forth the Court's ruling.

### II. PERTINENT FACTS

Plaintiff Diane Bredesen is employed as the "house contractor" for the Detroit Opera House (the "DOH"). Defendant Detroit Federation of Musicians (the "Union") represents musicians employed at the

DOH, the Fisher and Fox Theatres, and the Masonic Temple.[1] Each of the theatres has its own collective bargaining agreement with the Union.

House contractors are responsible for hiring the "pick up" orchestras that perform traveling shows at their respective theatres. They also ensure that musicians understand the performance schedules, any applicable rules, and any information particular to the show. They enforce dress codes, ensure the presence of the required orchestra players despite sickness or other reasons for absence, and serve generally as the musicians' liaison to the conductor and the theatre.

At all times relevant to this lawsuit, there were three house contractors employed under Union contracts within the Detroit metropolitan area—Ms. Bredesen at the DOH, John Trudell at the Fox Theatre, and Max Leib[2] at the Fisher and Masonic Temple.[3] Ms. Bredesen and Mr. Trudell also often play in the orchestras.

Plaintiff began her position of house contractor for the DOH when it acquired its home in 1996. She became the only woman to hold that position in any major Detroit area venue, union or non-union, and the first woman in the Union's history to hold that position. When she was offered the job in 1996, Plaintiff asked union President Carl Austin to negotiate a "double scale" salary for her as house contractor. Austin told her that all of the house contractors were paid the same rate for such work, that this uniform rate was a single side-musician's scale, and that the house contractor rate of pay was required by the Union to be uniform at all venues so that they would not compete with one another. [*See* Bredesen Dep pp. 100–102.] Ms. Bredesen accepted Mr. Austin's assertions at face value. Accordingly, Austin negotiated for her the regular "side-musician" rate, i.e., single scale, after telling her that this single scale was what all the local venues were paying their house contractors. This rate was incorporated into the 1996–1998 DOH Collective Bargaining Agreement. In pertinent part, that Agreement provided as follows:

> Local musicians for all attractions as outlined below, including rentals, must be engaged by and under the supervision of the house contractor.

> \*   \*   \*   \*   \*   \*

> (3) The MOT Personnel Manager shall be the House Contractor.... The Employer reserves the right of approval and engagement of the Personnel Manager/House Contractor.

> (4) *Scale of Wages*

> (4.1) MUSICAL SHOWS AND VARIETY SHOWS

>> For eight (8) shows or less played within not more than six (6) consecutive days:

>> For the period September 1, 1996 to August 31, 1997, $862.00 per week for each sidemusician.

1.  The Union also represents employees of the Detroit Symphony Orchestra, but since that entity does not utilize a "house contractor," its contract with the Union has no bearing on this case.

2.  Mr. Leib passed away shortly after this lawsuit was filed, and, consequently, he was never deposed in this action. However, he was the house contractor for the Fisher and Masonic Temple at the time of his death, a position that he held at one or both of those venues for fifty years. *See* Deposition of current Union President Joseph Skrzynski, p. 59.

3.  Other major venues in the Metropolitan Detroit area, including the Palace of Auburn Hills, Meadowbrook Theatre, and Pine Knob, are non-union.

For the period September 1, 1997 to August 31, 1998, $896.00 per week for each sidemusician.

Any and all performances played in less than six (6) consecutive days shall be paid for at the pro-rata performance rate of $107.75 in year one and $112.00 in year two. **The Contractor shall receive regular sidemusician's scale for services as Contractor for the engagement of up to thirty (30) musicians, and one and one-half (½) the sidemusician's scale for the engagement of 31 to 55 musicians, and double the sidemusician's scale for the engagement of 56 or more musicians.[4] Should the Contractor be a player in the orchestra he/she shall receive in addition to the Contractor fee, sidemusician's scale for playing.**

[See Plaintiff's Ex. A, p. 1 (emphasis added).][5]

In October 1999, Plaintiff discovered that Carl Austin's representations that all of the local theatres were paying their house contractors the single side-musician's scale was false and that in fact, at least as of September 1996, i.e., when the first DOH–Detroit Federation of Musicians contract was executed, all of the other Detroit area venues were paying

their house contractors—all males—double the regular side-musician's scale. [See Plaintiff's Exs. B1, B2 and C. See also Deposition of current Union President Joseph Skrzynski, pp. 58–59.][6] As a matter of fact, John Trudell, the House Contractor at the Fox Theatre and the Vice-President of the Union, testified that the Fox Agreement has provided for double scale for the house contractor since at least 1990. [Trudell Dep. pp. 16–18.] Even the Macomb Center, a very small union venue, has always paid its house contractor double scale. Id. pp. 15–16.[7] Mr. Trudell testified that before the Fox agreements were negotiated, he told Carl Austin and Byron Taylor, the Secretary–Treasurer of the Union, that "[he] wanted double scale if [he] was to be the House Contractor," and Austin complied with Trudell's demand. Id. p. 31. President Skrzynski emphasized in his deposition that the double scale rates in the Fisher, Fox and Masonic Temple contracts refer only to house contractor services; a contractor who also plays in the orchestra is paid the regular side-musician's scale for musician's services in addition to the house contractor double scale wage. [Skrzynski Dep. p. 53.]

4. Plaintiff states that these higher rates for orchestras of more than 30 musicians were merely "window dressing" because, with the exception of the Christmas holiday production of the Nutcracker Suite, the orchestras never exceeded 30 musicians.

5. In September 1998, a new contract was negotiated which called for the DOH House Contractor to receive the regular side-musician's scale plus 12%. [See Defendant's Ex. 5.]

6. Plaintiff's Exhibit B1 is the Fisher Theatre 1996–1999 Agreement governing the "musical services of musicians under the contractorship and/or leadership of Max Leib" and expressly provides, "Contractor/leader shall re-

ceive double regular sidemusician's scale." Exhibit B2 is the 1996–1999 Masonic Temple Agreement, which also specifically designates Max Leib as "House Contractor," and like the Fisher Agreement provides, "Contractor/leader shall receive double regular sidemusician's scale." Exhibit C is the Fox Theatre 1994–1996 Agreement designating John Trudell as House Contractor and provides that "House Contractor shall receive double regular sidemusician scale for his services."

7. Larry Teal was the house contractor at the Macomb Center until he retired in 1995 or 1996. [Trudell Dep. pp 14, 16.] John Trudell now performs house contractor services at that venue where he is paid double scale. [Id. pp 15–16.]

Additionally, both Mr. Trudell and Mr. Leib were themselves signatory parties to their collective bargaining agreements, in their own names, giving them the right to enforce their house contractor rights under the agreements themselves. *See* Plaintiff's Exs. B1, B2 and C *See also* Trudell dep. p. 25. Ms. Bredesen was afforded no such right; she was not a signatory to her DOH contracts.

Plaintiff also claims that once she became house contractor for the DOH, Carl Austin tried to bully her into allowing him and other union officials to dictate her hiring decisions. [Bredesen Dep. pp. 52–53.] When she proceeded to make her own hiring decisions without their input, Austin became infuriated with her, threatened to "take away her job" and told her that "he was going to get [her]." *Id.* at 57–58. "[H]e said it's time the boys sit down and teach you a lesson and teach you the way it has to be done." *Id.* at 58.

Austin and Union Secretary–Treasurer Byron Taylor sought to bring her before the Executive Board for potential discipline because of her "hiring practices." *See* Plaintiff's Ex. G. Bredesen sought the protection of the International Union and, it was only after Conductor Kevin Farrell interceded on her behalf that the International Union ordered Austin to stop harassing her and to apologize to her. Plaintiff claims that Austin did not pursue the threatened disciplinary action, but he did not stop harassing her and never did apologize to her. *Id.* at 73–79.

As indicated, it was not until October 1999 that Plaintiff learned that all of the other house contractors within Local 5's jurisdiction were being paid double scale.[8] Plaintiff proceeded to obtain copies of the Union contracts with the other venues. She presented this documentation to her employer, the DOH, and on November 2, 1999, the DOH readily signed a side letter providing her a double scale as house contractor. *See* Plaintiff's Ex. D. The DOH asked the Union to sign the side letter, but the Union balked, asserting that the Fisher and Masonic agreements provided only a single scale for the house contractor services of Max Leib. *See* Plaintiff's Ex. E. It was not until April 19, 2000—after it was served with the Complaint in this action—that the Union signed the side letter agreement, editing out of the letter all reference to the fact that the other venues paid their house contractors double scale. *See* Plaintiff's Ex. F. *See also* Skrzynski Dep. p. 61.

Plaintiff instituted this action against the Union on April 4, 2000. In her Complaint, Plaintiff asserts two counts: Breach of Duty of Fair Representation in violation of the Labor Management Relations Act, 29 U.S.C. § 185, *et seq.* (the "LMRA") (Count I), and a pendent Michigan Elliott–Larsen sex discrimination claim (Count II).

---

8. Ms. Bredesen testified that she learned for the first time that her house contractor rate was half the rate negotiated for the Union's other house contractors on October 6, 1999 when John Trudell's son, Steve Trudell, informed her that his father was paid at twice the side-musician's scale for his house contractor services. [Bredesen Dep. pp. 48–51.] Bredesen explained that Steve, who is a non-union house contractor for Pine Knob, the Palace, and Meadowbrook, had contacted her at his father's suggestion. *Id.* at 50. Steve was doing a bid to get a job with the road production of *Sunset Boulevard,* which would be a union position, and because he had only worked in non-union venues, he went over his father's Fox contract with him so that he would be able to do the bid according to union rules. *Id.* at 49–50. After going over his Fox contract with Steve, his father suggested that he contact Plaintiff to see if she could think of anything that he might have forgotten. *Id.* at 50. Plaintiff went over her DOH contract with Steve and it was in doing so that Steve told her that his father was getting double scale. *Id.* Steve Trudell corroborated Bredesen's testimony. [Steve Trudell Dep. p. 36.]

Specifically, Plaintiff alleges that the Union knowingly and intentionally negotiated a contract which caused her to be paid at half the rate paid to all other house contractors under other union agreements, and that the Union did so with malice and hostile discrimination toward her in breach of its duty of fair representation. [Complaint ¶¶ 28–29.] She further alleges that the Union has interfered with her employment relationship with the DOH for the purpose of ending or damaging that relationship and reducing her rate of pay as DOH house contractor. *Id.* ¶ 30.

With respect to her Elliott–Larsen claim, Plaintiff alleges that the Union discriminated against her based upon her sex in negotiating her pay as DOH house contractor at a rate that was half the rate that the Union negotiated for male house contractors and deceiving her as to her rightful rate of pay. *Id.* ¶¶ 32–33.

Defendant now moves for summary judgment [9] arguing that Plaintiff's Elliott–Larsen sex discrimination claim is preempted under Section 301 of the LMRA and/or under federal labor law governing the duty of fair representation. Defendant also argues that Plaintiff's DFR claim must be dismissed for failure to exhaust internal union remedies and/or by the six-month statute of limitations applicable to such claims.

## A. STANDARDS APPLICABLE TO MOTIONS FOR SUMMARY JUDGMENT

Summary judgment is proper " 'if the pleadings, depositions, answer to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.' " Fed. R.Civ.P. 56(c).

Three 1986 Supreme Court cases—*Matsushita Electrical Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); and *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)—ushered in a "new era" in the standards of review for a summary judgment motion. These cases, in the aggregate, lowered the movant's burden on a summary judgment motion.[10] According to the *Celotex* Court,

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof.

*Celotex,* 477 U.S. at 322, 106 S.Ct. 2548.

After reviewing the above trilogy, the Sixth Circuit established a series of principles to be applied to motions for summary judgment. They are summarized as follows:

> * Cases involving state of mind issues are not necessarily inappropriate for summary judgment.

---

9. Defendant has actually moved for "Judgment on the Pleadings or Summary Judgment." Because both parties have presented and rely upon matters outside the pleadings, as provided in Fed.R.Civ.Pro. 12(c), the Court will treat this Motion, not as one for judgment on the pleadings, but rather as a Fed.R.Civ. Pro. 56 motion for summary judgment.

10. "Taken together the three cases signal to the lower courts that summary judgment can be relied upon more so than in the past to weed out frivolous lawsuits and avoid wasteful trials." 10A Charles A. Wright, Arthur R. Miller, Mary Kay Kane, *Federal Practice & Procedure,* § 2727, at 35 (1996 Supp.).

* The movant must meet the initial burden of showing "the absence of a genuine issue of material fact" as to an essential element of the non-movant's case. This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.

* The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."

* The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

* The trial court has more discretion than in the "old era" in evaluating the respondent's evidence. The respondent must "do more than simply show that there is some metaphysical doubt as to the material facts." Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is plausible.

*Betkerur v. Aultman Hospital Association,* 78 F.3d 1079, 1087 (6th Cir.1996).

*See also, Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1479–80 (6th Cir.1989). The Court will apply the foregoing standards in deciding Defendant's motion for summary judgment in this case.

## B. *PLAINTIFF'S ELLIOTT–LARSEN CLAIM IS NOT PREEMPTED UNDER FEDERAL LABOR LAW*

Defendant argues that Plaintiff's state law sex discrimination claim is preempted under (1) Section 301 of the LMRA and/or (2) under federal labor law governing a union's duty of fair representation. This latter type of preemption has been referred to as *Brown* preemption.[11]

### 1. *BROWN PREEMPTION*

■ The doctrine that has come to be referred to as *"Brown* preemption" stands for the proposition that the States may not regulate conduct that is actually protected by federal law. *Brown v. Hotel and Restaurant Employees & Bartenders Int'l Union Local 54,* 468 U.S. 491, 104 S.Ct. 3179, 82 L.Ed.2d 373 (1984). This principle flows directly from the Supremacy Clause of the United States Constitution. *Id.* 104 S.Ct. at 3185.

At issue in *Brown* were New Jersey statutory provisions requiring the registration of casino hotel employees which

---

**11.** *Brown v. Hotel & Restaurant Employees & Bartenders,* 468 U.S. 491, 104 S.Ct. 3179, 82 L.Ed.2d 373 (1984). Plaintiff mischaracterizes this latter preemption argument as involving *Garmon* preemption, *see San Diego Building Trades Council v. Garmon,* 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959). *Garmon* preemption concerns federal protection of the primary jurisdiction of the National Labor Relations Board. In *Garmon,* the Supreme Court held that "[when an activity is arguably subject to § 7 or § 8 of the [National Labor Relations] Act, the States as well as the federal courts must defer to the exclusive competence of the National Labor Relations Board if the danger of state interference with national policy is to be averted]." 359 U.S. at 249, 79 S.Ct. at 780. The purpose of the *Garmon* rule, thus, is to ensure that disputes within the Board's expertise are first committed to it. *Brown, supra,* 104 S.Ct. at 3186. *See also, Jones v. Truck Drivers Local Union No. 299,* 838 F.2d 856, 874 (6th Cir.1988) (Merritt, J., concurring in part). However, the Supreme Court made clear in *Vaca v. Sipes,* 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967), that the NLRB has no special expertise over claims of a union's breach of its duty of fair representation, and thus, *Garmon* preemption is inapplicable to this class of cases. 87 S.Ct. at 912–14. *See also, Brown, supra.*

subjected casino employees to certain registration disqualification criteria and authorized the New Jersey Casino Control Commission to revoke the registration of any casino hotel employee who would be disqualified from registration. The New Jersey statute also imposed certain penalties on labor organizations representing casino hotel employees. Specifically, the statute precluded unions from collecting dues from any casino hotel employee if any union officer, agent or principal employee was disqualified in accordance with the criteria set forth in the statute. The Hotel and Restaurant Employees and Bartenders Union filed a complaint in federal court seeking declaratory and injunctive relief to preclude implementation of the casino employee registration provisions arguing that the statutory provisions were preempted by federal labor law, specifically Section 7 of the National Labor Relations Act, insofar as they empowered the Casino Control Commission to disqualify elected union officials.

Although the Supreme Court ultimately determined that the NLRA did not preclude the imposition of qualification standards on casino industry union officials and, hence, did not preempt the New Jersey statute, the Court painstakingly delineated the contours of what some lower courts have referred to as *"Brown* pre-emption," stating as follows:

> When federal pre-emption is invoked under the directive of the Supremacy Clause, it falls to this Court to examine the presumed intent of Congress. Our task is quite simple if, in the federal enactment, Congress has explicitly mandated the pre-emption of state law, or has adequately indicated an intent to occupy the filed of regulation, thereby displacing all state laws on the same subject. **Even in the absence of such express language or implied congressional intent to occupy the field, we** **may nevertheless find state law to be displaced to the extent that it actually conflicts with federal law. Such actual conflict between state and federal law exists when "compliance with both federal and state regulations is a physical impossibility," or when state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."**

These pre-emption principles are no less applicable in the field of labor law. Section 7 of the NLRA, the provision involved in this case, neither contains explicit pre-emptive language nor otherwise indicates a congressional intent to usurp the entire filed of labor-management relations. The Court has, however, frequently applied traditional pre-emption principles to find state law barred on the basis of an actual conflict with § 7. If employee conduct is protected under § 7, then state law which interferes with the exercise of these federally protected rights creates an actual conflict and is pre-empted by direct operation of the Supremacy Clause.

Appellants argue that the appropriate framework for pre-emption analysis in these cases is the balancing test applied to those state laws which fall within the so called "local interests" exception to the pre-emption doctrine first set forth in *San Diego Building Trades Council v. Garmon.* They contend that because New Jersey's interest in crime control is "so deeply rooted in local feeling and responsibility," *ibid,* the Act may be sustained as long as the magnitude of the State's interest in the enactment outweighs the resulting substantive interference with federally protected rights. This argument, however, confuses pre-emption which is based on actual federal protection of the conduct at issue from

that which is based on the primary jurisdiction of the National Labor Relations Board (NLRB). In the latter situation, a presumption of federal pre-emption applies even when the state law regulates conduct only arguably protected by federal law. Such a pre-emption rule avoids the potential for jurisdictional conflict between state courts or agencies and the NLRB by ensuring that primary responsibility for interpreting and applying this body of labor law remains with the NLRB. This presumption of pre-emption, based on the primary jurisdiction rationale, properly admits to exception when unusually "deeply rooted" local interests are at stake. In such cases, appropriate consideration for the vitality of our federal system and for a rational allocation of functions belies any easy inference that Congress intended to deprive the States of their ability to retain jurisdiction over such matters. We have, therefore, refrained from finding that the NLRA pre-empts state court jurisdiction over state breach of contract actions by strike replacements, state trespass actions, or state tort remedies for intentional infliction of emotional distress.

If the state law regulates conduct that is actually protected by federal law, however, pre-emption follows not as a matter of protecting jurisdiction, but as a matter of substantive right. Where, as here, the issue is one of an asserted substantive conflict with a federal enactment, then "[t]he relative importance to the State of its own law is not material . . . for the Framers of our Constitution provided that federal law must prevail."

468 U.S. at 501–03, 104 S.Ct. at 3185–86 (citations omitted and emphasis added).

As indicated in the above-quoted excerpt from *Brown,* the Supreme Court narrowly defined the occasions for finding state law

to be displaced to the extent that it "actually conflicts" with federal law:

> Such actual conflict between state and federal law exists when "compliance with both federal and state regulations is a physical impossibility," or when state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."

*Id.* at 501, 104 S.Ct. 3179.

Defendant argues that a number of courts have applied *Brown,* in finding state law anti-discrimination laws preempted. For example, Plaintiff relies upon *Jones v. Truck Drivers Local Union No. 299,* 838 F.2d 856 (6th Cir.1988) (*"Jones I"*). In that case the plaintiffs, female members of Local 299, asserted that their union failed to fairly represent them because of their sex in breach of their duty of fair representation under federal labor law and in violation of Section 204 of the Michigan Elliott–Larsen Civil Rights Act, M.C.L. § 37.2204, which provides:

> Sec. 204. A labor organization shall not:
>
> (a) Exclude or expel from membership, or otherwise discriminate against a member or applicant for membership because of religion, race, color, national origin, age, sex, height, weight, or marital status.
>
> (b) Limit, segregate, or classify membership or applicants for membership, or classify or fail or refuse to refer for employment an individual in a way which would deprive or tend to deprive that individual of an employment opportunity, or which would limit an employment opportunity, or which would adversely affect wages, hours, or employment conditions, or otherwise adversely affect the status of an employee or an applicant for employment because of religion, race, color, national origin,

age, sex, height, weight, or marital status.

(c) Cause or attempt to cause an employer to violate this article.

(d) Fail to fairly and adequately represent a member in a grievance process because of religion, race, color, national origin, age, sex, height, weight, or marital status.

The Sixth Circuit held that the plaintiffs' discrimination claim under state law was preempted under federal labor law. The *Jones* court explained:

> The plaintiffs' action under state law is essentially the same as their claims under federal law against the union. They do not claim to be excluded from union membership, nor can they claim that seniority under the collective bargaining agreement was not followed.... There were no new rights created under the Michigan law nor any new duty imposed upon the union not already present under existing federal law.... This kind of claim, a failure to represent *fairly*, is essentially a matter of federal law....
>
> \*　\*　\*　\*　\*　\*
>
> ... [A] claim of sex discrimination as a basis for assertion of a failure to represent fairly ... is not essentially different from a claim of unfair labor practice by reason of some other kind of invidious

discrimination on the part of a union.... Unfair representation, then, is unfair representation, whether by reason of sex discrimination ... or a willful breach of responsibility to carry out the terms of a collective bargaining agreement for the benefit of union members and employees. The [discrimination] claims of plaintiffs under these circumstances related to a failure to fairly represent ... must be deemed foreclosed and preempted.

838 F.2d at 861.

Despite the apparent breadth of the above-quoted excerpt from *Jones I*, the court made clear that it was only holding that the plaintiff's claims were preempted under Section 301, **not** under any other federal labor law theory.[12] Rejecting Judge Merritt's analysis in his separate concurring/dissenting opinion, the *Jones I* court stated:

> Our concern in this case concerns the preemptive force of substantive federal law in respect to claims inextricably intertwined with the interpretation and construction of a collective bargaining agreement. We are not concerned with the question of jurisdiction between the NLRB and the federal courts. [Cases] cited by the dissent, [are] therefore not relevant here.

---

**12.** Subsequent Supreme Court and Sixth Circuit cases, however, appear to have abrogated the court's Section 301 preemption holding in *Jones I*. Indeed, the Sixth Circuit acknowledged that *Jones I* was probably no longer good law. *See Jones v. Cassens Transport*, 982 F.2d 983, 987 and n. 3 (6th Cir.1993) (*"Jones II"*). However, for purposes of the plaintiff's fourth appeal in the case, the court held that its prior decision in *Jones I* was the "law of the case." Specifically, the court stated:

Since we held previously that, in our view, [plaintiffs'] state sex-discrimination claims involved the construction of a collective bar-

gaining agreement and its seniority provisions, we did not grant a petition for rehearing after our decision in 838 F.2d 856. The plaintiffs' petition [for rehearing] was also viewed as untimely. That decision established the law of the case. **Even though subsequent decisions of our court or of the Supreme Court may, or may not cast doubt on our decisions, our previous holding, including the order entered of record after *Lingle* was announced, remains the law of the case.**
982 F.2d at 987 (footnote omitted and emphasis added).

838 F.2d at 863.[13]

In concluding that the plaintiffs' state law discrimination claims were preempted under Section 301, the *Jones I* court found *Maynard v. Revere Copper Products, Inc.*, 773 F.2d 733 (6th Cir.1985)—another case relied upon by Defendant here—controlling.

*Maynard* involved a union employee's claims of breach of duty of fair representation and of handicap discrimination under the Michigan Handicappers Civil Rights Act. In that case, the union moved for summary judgment on both of the plaintiff's claims contending that the plaintiff's claim for breach of the union's duty of fair representation was barred by the six-month *DelCostello* statute of limitations and that the claim under the Handicappers' Act was preempted by federal labor law. The district court granted the union's motion on both counts.

On appeal, the plaintiff conceded that his DFR claim was barred by the statute of limitations but argued that he was entitled to pursue his claim under the Michigan Handicappers' Act as a separate cause of action, unaffected by the demise of the fair representation claim. The Sixth Circuit disagreed and held that the handicappers' discrimination claim was preempted under federal labor law and as such, was also barred by the six-month *DelCostello*

statute of limitations. The Court explained:

In this case the district court found that the only provision of the Handicappers' Act which could provide a cause of action to the plaintiffs is that found in M.C.L.A. § 37.1204(d):

A labor organization shall not:

\*     \*     \*     \*     \*     \*

(d) fail to fairly and adequately represent a member in a grievance process because of a member's handicap.

The court concluded that this provision created no new rights for an employee and imposed no duty on a union not already clearly present under existing federal labor law. Since the section 301 claim for failure to provide fair and adequate representation was barred by limitations, the court found that it would be anomalous to hold that the same claim survived the defense of limitations because it was stated in terms of the state law designed to protect handicapped workers from discrimination. It was in the context of the statute of limitations bar that the *Maynard* stated:

We agree with the district court. The doctrine of preemption is firmly established in labor law. The duty of fair representation relates to an area of labor law which has been so fully occupied by Congress as to foreclose state regula-

---

**13.** Indeed, it is Judge Merritt's concurring/dissenting opinion that *Brown* preemption is discussed:

The simplest preemption doctrine provides that the States may not regulate conduct that is actually protected by federal law. *See Brown v. Hotel and Restaurant Employees Local 54, [supra].* This principle is applicable to every conflict between state and federal substantive law, and flows directly from the Supremacy Clause. *Id.* Courts must first determine whether a federal right exists, and then assess the impact of a state regulation upon that federal right.

This simple rule is also simple to apply in the present case. It cannot be argued that the NLRA, or any federal statute, gives a labor union the right to engage in sex discrimination. Indeed, this Circuit has held that sex discrimination by a union constitutes an unfair labor practice prohibited by § 8 of the NLRA. *NLRB v. Local 106, Glass Bottle Blowers Ass'n*, 520 F.2d 693 (6th Cir.1975).... There can be no argument, therefore, that the Michigan statute is preempted by a conflict with a federally guaranteed substantive right. 838 F.2d at 868.

tion. Whether union conduct constitutes a breach of the duty of fair representation is a question of federal law. The fact that an action for failure to represent a member may be brought in a state court is beside the point. Regardless of the forum in which the claim is presented the case in controlled by federal law.

As we construe the district court's oral ruling and written order, it did not decline the request to remand the Handicappers' Act claim on the ground that the federal district court was the only forum which had jurisdiction to consider it. The district court dismissed plaintiffs' claims rather than remanding them because federal law required dismissal regardless of whether the action was in a state or federal court. The duty of fair representation is a federally created statutory duty and federal law "governs" a cause of action for breach of that duty. Thus, if the district court had remanded the claims under the Handicappers' Act, the state court would have been required to apply federal law and hold that those claims, based on the alleged breach of the union's duty of fair representation, were barred by limitations.

773 F.2d at 735–36 (citations omitted).

■ Defendant contends that Plaintiffs claims in this case against the Detroit Federation of Musicians Local No. 5 are virtually indistinguishable from the claims of the plaintiffs in the above-cited cases. As in the *Jones* and *Maynard*, Plaintiff Bredesen alleges here two counts—one for breach of the duty of fair representation under Section 301 of the LMRA and one for violation of the labor organization provisions of the Michigan Elliott–Larsen Civil Rights Act. Both of these claims are predicated upon her allegations that the Union negotiated a discriminatory rate of pay for her at a rate half of that negotiated for male house contracts. *See* Complaint ¶¶ 28–30; 32–33. Defendant argues that no new rights are created in the Michigan Elliott–Larsen Act's labor organization provisions that do not already exist under well-established federal labor law governing a union's duty of fair representation. Therefore, the union contends that Plaintiff's sex discrimination claim in this case should be found to preempted under the federal labor law pursuant to the *Brown* doctrine.

While the Court acknowledges that Defendant has cited a number of district court decisions from other circuits which apparently have held state discrimination laws preempted under federal labor policy or "DFR preemption" doctrines,[14] none of these cases is binding upon this Court and this Court is not persuaded that these decisions represent the state of controlling law with respect to preemption and state

---

14. *See, Hess v. B & B Plastics Division of Metal Cladding, Inc.*, 862 F.Supp. 31 (W.D.N.Y.1994) (plaintiff's claim that her union discriminatorily refused to follow through on her grievance because of her sex in violation of the New York State Human Rights Law held preempted; the court determined that Congress intended preemptive coverage of any type of discrimination by a union against its members, at least in the context of the union's duty of fair representation); *Snay v. U.S. Postal Service*, 31 F.Supp.2d 92, 99 (N.D.N.Y.1998) (state law sex discrimination claim against her union held preempted); *Ro-* *dolico v. Unisys Corp.*, 96 F.Supp.2d 184, 188 (E.D.N.Y.2000) (same); *Wilhelm v. Sunrise Northeast, Inc.*, 923 F.Supp. 330, 337 (D.Conn.1995) (dismissing union member's state law discrimination claim against her union and holding that where state law "creates no new rights for the union member and imposes no new duty on the union not under federal labor law", such law is preempted by the DFR); *Jackson v. T & N Van Service*, 117 F.Supp.2d 457 (E.D.Pa.2000) (holding New Jersey state law discrimination claim preempted).

law discrimination claims. Indeed, the plain language of *Brown* indicates that preemption under the ruling of the Court in that case would apply only in the event of an *"actual conflict"* with the state law. In fact, the Supreme Court remanded the proceedings in *Brown* with directions for fact finding on whether the state law's sanction at issue in that case which allowed the banning of dues collection from unions which violated the state's casino regulations would *"effectively prevent the union from performing its functions"* as the bargaining representative. The Court sees no "actual conflict" between federal labor law regarding a union's duty of fair representation and the Michigan Elliott–Larsen Act such that enforcement of the Michigan statute would "effectively prevent the union from performing its functions."

Moreover, the Sixth Circuit cases which discussed *Brown* (or "DFR preemption" as characterized by Defendant) and relied upon by the union here simply are not the straightforward declarations of law that Defendant represents them to be. As indicated, the court in *Jones I*, although broadly discussing federal labor policy, made clear that it was ruling based upon Section 301 preemption, not *Brown* preemption or any other federal labor doctrine. And the *Maynard* court affirmed the dual dismissal of the plaintiff's identical DFR and discrimination claims based upon statute of limitations grounds finding that it would be unjust to enable the plaintiff to escape the DFR statute of limitations bar by allowing her the same relief "through the back door" by allowing her to proceed with her state law claim. The Court finds these decisions an insufficient basis to render the broad ruling on preemption the Defendant seeks here.

Furthermore, in the twenty-seven years since *Brown* was decided, the Supreme Court and the Sixth Circuit have repeated-

ly retreated from earlier decisions which had held various state law claims preempted under various aspects of federal labor law. *See e.g., Lingle v. Norge Division of Magic Chef, Inc.,* 486 U.S. 399, 108 S.Ct. 1877, 100 L.Ed.2d 410 (1988) (narrowing the scope of applicability of section 301 preemption to state law claims requiring interpretation of collective bargaining agreements); *Hawaiian Airlines v. Norris,* 512 U.S. 246, 114 S.Ct. 2239, 129 L.Ed.2d 203 (1994) (narrowing scope of RLA preemption of state law claims); *Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 100, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983) and *New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.,* 514 U.S. 645, 115 S.Ct. 1671, 131 L.Ed.2d 695 (1995) (narrowing scope of ERISA preemption).

For all of the foregoing reasons, the Court will deny Defendant's Motion for Summary Judgment on "federal labor law preemption" grounds.

## 2. *SECTION 301 PREEMPTION*

■ Defendant further argues that Plaintiff's sex discrimination claim is also preempted under Section 301 of the Labor Management Relations Act.

Section 301 of the LMRA reflects Congress' intent that a comprehensive, unified body of federal law should govern actions concerning the interpretation and enforcement of collective bargaining agreements made under the aegis of the Act. *Textile Workers v. Lincoln Mills,* 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957). Since 1962, the Supreme Court has held that section 301 preempts state laws that substantially depend upon analysis of the terms of collective bargaining agreements. *Allis–Chalmers Corp. v. Lueck,* 471 U.S. 202, 210, 105 S.Ct. 1904, 1910, 85 L.Ed.2d 206 (1985), (citing *Teamsters Local 174 v. Lucas Flour Co.,* 369 U.S. 95, 82 S.Ct. 571,

7 L.Ed.2d 593 (1962)). The Supreme Court clarified this rule in *Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 108 S.Ct. 1877, 100 L.Ed.2d 410 (1988), and explained:

> § 301 pre-emption ... says nothing about the substantive rights a State may provide to workers when adjudication of those rights does not depend upon the interpretation of such agreements....
>
> Even if dispute resolution pursuant to a collective-bargaining agreement, on the one hand, and state law, on the other, would require addressing precisely the same set of facts, as long as the state-law claim can be resolved without interpreting the agreement itself, the claim is "independent" of the agreement for § 301 pre-emption purposes.

486 U.S. at 409–10, 108 S.Ct. at 1883. As noted by the *Lingle* Court, an example of such "independent" claims which are not preempted under Section 301 are state laws that "grant nonnegotiable rights that are shared by all state workers." 486 U.S. at 407 n. 7, 108 S.Ct. at 1882 n. 7.

Applying *Lingle*, the Sixth Circuit has made clear that state anti-discrimination laws are not preempted under Section 301. This was clearly set forth by the Court in *Tisdale v. United Ass'n of Journeymen and Apprentices of Plumbing and Pipefitting Industry, Local 704*, 25 F.3d 1308 (6th Cir.1994), where the court explained:

> Title VII specifically does not preempt state civil rights actions. **It should be self-evident that if Congress did not preempt state civil rights actions by operation of federal civil rights laws it could not have meant to do so through federal labor law. As the Supreme Court has stated, "it would be inconsistent with congressional intent under [§ 301] to pre-empt state rules that proscribe conduct, or establish rights and obligations, independent of a labor contract."**

*Id.* at 1312 (quoting *Allis–Chalmers v. Lueck*, 471 U.S. at 212, 105 S.Ct. at 1912 (emphasis added)). *See also, Smolarek v. Chrysler Corp.*, 879 F.2d 1326 (6th Cir. 1989); *O'Shea v. Detroit News*, 887 F.2d 683 (6th Cir.1989); *Welch v. General Motors Corp., Buick Motor Div.*, 922 F.2d 287 (6th Cir.1990).

The foregoing discussion makes clear to this Court that Plaintiff's Elliott–Larsen claim is not preempted under Section 301.

## C. *PLAINTIFF FAILED TO EXHAUST HIS INTRA–UNION REMEDIES*

■ It is undisputed that Plaintiff never attempted to pursue any extra-judicial, intra-union remedies regarding any of the claims she raises in this lawsuit. Article 12, Section 27 of the Bylaws of the American Federation of Musicians [15] specifically provides:

> Members are required to exhaust all remedies and appeals provided by their Locals and/or the Federation before proceeding in a court or any other tribunal against any member, Local or the Federation.

[Defendant's Ex. A, p. 57.]

Article 2, Section 1 of the Federation Bylaws requires members and Locals to "treat[ ] each other with respect and dignity without regard to ethnicity, creed, sex, age, disability, citizenship, sexual orientation, marital status, family status, or national origin." Article 5, Section 24 fur-

---

**15.** The Detroit Federation of Musicians Local No. 5 is affiliated with the American Federation of Musicians. *See* Constitution and Bylaws of the Detroit Federation of Musicians, Defendant's Ex. B and the Bylaws of the American Federation of Musicians, Defendant's Ex. A.

ther provides that "Locals shall provide, at no additional expense to the members involved ..., at least the following services: (1) competent representation in negotiations...."

Article 7, Section 5 provides a mechanism for an aggrieved union member to bring charges against a Local for failing to comply with any provision of the Federation Bylaws. *Id.* p. 34. That section specifies that such charges may be filed with the International President, the International Secretary–Treasurer or the IEB [International Executive Board]. *Id.* The trial of the charges is conducted before the IEB. *Id. See also* Article 3, Section 8(1), Defendant's Ex. A, p. 19. Claims and charges against a Local must be filed within one year from the date of events that gave rise to the claim or from the date on which the relevant facts became known or reasonably could have become known, whichever is later. *See* Article 5, Section 13, Defendant's Ex. A, p. 28.

In *Clayton v. International Union,* 451 U.S. 679, 101 S.Ct. 2088, 68 L.Ed.2d 538 (1981), the Supreme Court declined to impose a universal requirement of exhaustion of internal union remedies. Rather, the Court held that whether to require exhaustion of intra-union remedies is a matter of discretion for trial courts to decide. 451 U.S. at 698, 101 S.Ct. at 2095. In exercising this discretion, the *Clayton* Court instructed lower courts to consider three factors:

> [F]irst, whether union officials are so hostile to the employee that he could not hope to obtain a fair hearing on his claim; second, whether the internal union appeals procedures would be inadequate either to reactivate the employee's grievance or to award him the full relief he seeks under § 301; and third, whether exhaustion of internal procedures would unreasonably delay the employ-ee's opportunity to obtain a judicial hearing on the merits of his claim.

*Id.* If any of these factors are found to exist, the court may properly excuse the employee's failure to exhaust. *Id.*

Turning then to the record in this case, there is nothing of record to establish that any of the *Clayton* factors exist here. First, there is no evidence of any hostility towards Plaintiff on the part of the union officials who would hear her intra-union claim. To constitute futility under *Clayton,* a plaintiff must show that union hostility is so pervasive that it affects every step of the internal claims process. *Sosbe v. Delco Elec.,* 830 F.2d 83 (7th Cir.1987). *See also, Rogers v. Bd. of Education,* 2 F.3d 163, 167 (6th Cir.1993). Hostility on the part of the local union does not necessarily show hostility on the part of the international union. *Id. See also, Monroe v. International Union, UAW,* 723 F.2d 22, 25 (6th Cir.1983). As indicated, pursuant to the AFM internal union procedures, Plaintiff could have filed charges against her Local with the International President, the International Secretary–Treasurer or the IEB and a trial would then have been conducted before the IEB. None of the Local officials whose conduct Plaintiff calls into question in this action, thus, would have been involved in hearing her intra-union claim. Indeed, it appears that Plaintiff now concedes this fact. [*See* Plaintiff's Response Brief, pp. 14–15.] Furthermore, Plaintiff has neither alleged nor proven that the internal claim procedures are not fair and reasonable. Therefore, the first *Clayton* factor is not satisfied.

Second, a review of the internal union procedures demonstrates that the relief available to Plaintiff under the Federation Bylaws would have been adequate to compensate her if she were to succeed with her intra-union claim. Article 13, Section 20 of the Bylaws provides that if a defen-

dant is found guilty of a violation of a Federation Bylaw and it is determined that the violation has resulted in depriving a member of compensation that would have otherwise been due, then, in addition to any other fine that may be imposed, the IEB shall collect from the defendant and distribute to the member "the full amount of unpaid compensation plus accrued interest." Defendant's Ex. A, p. 61. Additionally, Section 13 provides for the IEB's imposition of a fine of up to $10,000. *Id.* p. 58.

Finally, there is nothing of record to suggest that exhaustion of internal procedures would unreasonably delay Plaintiff's opportunity to obtain a judicial hearing on the merits of her claim.

Because none of the *Clayton* factors are satisfied, there is no basis for this Court to excuse Plaintiff's failure to exhaust her intra-union remedies. *See Wagner v. General Dynamics,* 905 F.2d 126 (6th Cir. 1990). Plaintiff's unexcused failure to exhaust her intra-union remedies, mandates dismissal of her DFR claim in this action. *Clayton v. International Union, supra,* 451 U.S. at 696, 101 S.Ct. at 2099; *Wagner v. General Dynamics, supra; Rogers v. Bd. of Education, supra.*[16]

### CONCLUSION

For all of the foregoing reasons,

IT IS HEREBY ORDERED that Defendant's Motion for Summary Judgment be, and hereby is, GRANTED, in part, and DENIED, in part. Defendant's Motion is GRANTED with respect to Plaintiff's breach of duty of fair representation claim in Count IV(A) of her Complaint, but DE-NIED with respect to Count IV(B). This case, accordingly, will proceed on her state law claim of sex discrimination.

SO ORDERED.

---

**16.** Defendant also argues for dismissal of Plaintiff's Complaint on statute of limitations grounds. However, the Court finds that there is no evidence of record to suggest that Plaintiff knew, or should have known, prior to October 6, 1999 that the other house contrac-tors within the Union's jurisdiction were getting "double scale" wages. [*See* p. 7 of this Opinion and Order.] Therefore, the filing of this lawsuit on April 4, 2000 was within the 6–month *DelCostello* period of limitations.